Walter Joe BROWN, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 89–186.

Supreme Court of Wyoming.

Aug. 23, 1991.

891

Leonard Munker, State Public Defender, and Mike Cornia (argued), Appellate Counsel, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Asst. Atty. Gen., and James C. Anderson (argued), Sp. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

Appellant Walter Joe Brown was convicted of incest in May 1986 based in significant part upon the testimony of his daughter (MCX) who was the victim of the incest. That conviction was affirmed on appeal. *Brown v. State*, 736 P.2d 1110 (Wyo.1987). Brown's motion for new trial was premised

on new evidence in the form of a recantation by MCX. At the hearing on the motion for new trial, MCX testified that she lied at her father's original trial. The district court found that the recantation was not credible and denied the motion for new trial.

We affirm.

## ISSUES

■ Brown claims the district court misapplied the standard for addressing motions for new trial premised on newly discovered evidence which was adopted by this court in *Opie v. State*, 422 P.2d 84, 85 (Wyo.1967); *see also King v. State*, 780 P.2d 943, 947–51 (Wyo.1989). The *Opie* standard requires that these four elements be present: (1) The evidence has come to defendant's knowledge since the trial; (2) it was not owing to a want of due diligence that it was not discovered sooner; (3) it is so material that it would probably produce a different verdict if the new trial were granted; and (4) it is not cumulative of other evidence presented at trial. *Id.* Brown claims his evidence met the requirements of the *Opie* test and it was an abuse of discretion for the district court to have denied the motion for new trial. The *Opie* test alone does not adequately address new trial motions based upon recanted testimony unless we say such testimony is *immaterial* under item 3 of the test if false. The *Larrison* test, *infra*, adds this same requirement in a more clear and understandable way.

Brown also asserts that the proper standard to be applied in this case is that expressed in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928). The *Larrison* test is a standard applied by some federal courts when a motion for new trial is based on a witness's recantation of her trial testimony. Under that standard the district court must be satisfied: (1) That the recanted testimony given by the material witness is false; (2) that in its absence a different verdict might have been reached; and (3) that the defendant was taken by surprise by the testimony when it was given and was unable to meet it, or did not

know about its falsity until after the trial. It should be noted that federal courts apply a variety of standards when addressing new trial motions based on a witness's recantation of trial testimony. Annotation, *Recantation of Testimony of Witness as Grounds for New Trial—Federal Criminal Cases*, 94 A.L.R.Fed. 60 (1989).

In response, the State claims that the district court properly applied the *Opie* test and that this court need not adopt the *Larrison* test.

## FACTS

On May 23, 1989, Brown timely filed a motion for new trial in accordance with W.R.Cr.P. 34. The motion was premised on recantations made by MCX in an affidavit and a letter to the Warden of the Wyoming State Penitentiary, as well as a recantation contained in a typewritten letter signed by his other daughter (KX) who had testified at trial that she too was a victim of incest at the hands of Brown. KX's letter was written to the Governor of Wyoming for the apparent purpose of seeking executive clemency. There was no effort to establish who wrote or signed the letter to the governor, nor to authenticate it or introduce it into evidence. KX did not testify at the hearing on the motion for new trial. It might be assumed that she was unwilling, under oath, to recant her trial testimony. Thus, there is no evidence in the record that KX ever recanted her sworn testimony given at the original criminal trial.

At the hearing on the motion for new trial, the first piece of evidence to be introduced was an affidavit of a juror from the original criminal proceedings. Donna McCarty could not say for sure what others had convinced her of during the jury deliberations, but she was uncomfortable at that time with reasonable doubt. She voted to convict anyway. She talked to Judge Troughton after the trial and asserted that he said "the verdict would stand because the man was guilty and you can't second guess yourself." She also indicated that, as for her, she felt the verdict would most likely be different if the information

concerning the recantation had been presented at trial.

The first testimony was from MCX, who was represented at the proceedings by counsel. Her testimony was lengthy between direct, cross, redirect, recross, re-redirect and re-recross, but the gist of her testimony was that she had lied at her father's original trial to take revenge on him for having grounded her. No other evidence was presented by Brown in support of his motion for new trial.

As the first witness for the prosecution, the district court heard testimony from a psychiatric nurse from Southwest Counseling in Rock Springs who related her experiences dealing with victims of incest. She related that there are frequently recantations in such cases because of family pressures. A transcript of the testimony of Dr. Reisinger, a psychologist and expert in dealing with cases of child sexual abuse, was admitted from the original criminal case. However, the district court made it clear that it did not consider the testimony of the experts in reaching its decision, and especially it did not consider any of their testimony that sounded like they were vouching for the credibility of witnesses.

Terry White, Manager of the Uinta County Office of the Department of Public Assistance and Social Services (DPASS), testified that MCX had been a ward of the State since October 1985 and had been placed in a variety of foster homes, group homes and a state institution. White was aware that there was a very strained relationship between MCX and her mother and that MCX indicated to him that the only way she could return home, which she desperately wanted to do, was to recant her testimony. Sonny Hodgdon, an employee of the Youth Alternative Home Association of Evanston, was acquainted with MCX from her placement there and testified that she told him she wanted to return home, and the only way she could do so was to recant her testimony. The evidence also included a certificate of appointment and letter of commendation to MCX for her service in the United States Navy which she joined in April 1989. Finally, the record of the hearing on the motion for new trial contained the records of all juvenile proceedings concerning MCX. Of special interest is MCX's testimony that her mother, Lawana Brown, told her she was no longer welcome in the family home, but that her mother had subsequently gone to counseling and accepted the things her father did to her. Lawana Brown did not testify at the hearing on the motion for new trial, but she did testify on behalf of her husband at the original criminal proceedings. Despite the fact that Brown was found guilty of molesting KX and admitted to molesting MCX during family counseling sessions, Lawana Brown testified that she did not think it was possible that her husband could have engaged in incest with MCX. MCX claimed that all incidents of incest occurred in her mother's absence.

It is also necessary for the disposition of this case to provide a summary of the salient evidence presented at the original criminal proceedings which took place in February and March of 1986. MCX testified that Brown had had sexual intercourse with her on several occasions, most recently in early August of 1985. In October of 1985, MCX reported these incidents to DPASS. MCX testified to the details of her rather long-term sexual involvement with Brown, but it is unnecessary for us to repeat any more detail concerning that relationship. Rebecca Langley testified that she was the DPASS social worker who took MCX's report and conducted an evaluation of Brown's home. This study was precipitated because KX had accused Brown of perpetrating incest on her. As a result of her accusations, criminal charges were brought against Brown, and he was placed on probation. At the time of the home study, both girls were placed in shelter care. Eventually MCX returned home, but KX remained a ward of the State and has never returned home. In one of Langley's counseling sessions with Brown, he admitted to her that as a part of a so-called "sex education program" he demonstrated what it meant for a man to have a "hard-on" by having MCX touch his erect penis. On another such "teaching/learning occasion," Brown unbuttoned MCX's blouse and mas-

saged the nipple of her breast in order to establish that it was activity such as that which caused her to lose control of her emotions. Brown admitted to these incidents in his testimony at his trial, but denied ever having had sexual intercourse with his daughters. We note at this juncture that the specific charge against Brown at the original trial was that he had sexual intercourse with MCX in early August of 1985. KX also testified and related her incestuous relationship with Brown. Her testimony was admitted for the limited purpose of showing a common scheme or plan. A psychologist who evaluated MCX testified and expressed her opinion that her evaluation of MCX was consistent with her having been the victim of sexual abuse.

## DISCUSSION

The grant or denial of a motion for new trial is within the sound discretion of the trial court. *Story v. State*, 788 P.2d 617 (Wyo.1990); *Best v. State*, 769 P.2d 385, 387–88 (Wyo.1989). The decision of the district court on such a motion will be upheld absent an abuse of discretion. *Id.; Keser v. State*, 737 P.2d 756, 759 (Wyo. 1987). We have also held that recanted testimony is viewed with the utmost suspicion. *Burns v. State*, 574 P.2d 422, 424 (Wyo.1978); *Jones v. State*, 568 P.2d 837, 854 (Wyo.1977); *Sims v. State*, 495 P.2d 256, 258 (Wyo.1972). We see no reason for deviating from the basic rule for evaluating district court decisions on motions for new trial. *Opie v. State*, 422 P.2d at 85. However, we will enlarge on that general rule somewhat to provide additional guidance in cases, such as this, which involve recanted testimony. To that purpose, we agree with the Supreme Court of Montana that granting a person of questionable credibility and motive carte blanche to overturn the determination of a jury operating within the bounds of our constitutional protections is not conducive to the sound administration of justice. *State v. Perry*, 232 Mont. 455, 758 P.2d 268, 275 (1988). Therefore, we adopt the following rule espoused by that court, as well as several others:

"In light of the inherent suspicion surrounding recanted testimony and the

public interest in swift and sure justice, we believe the better reasoned approach to be that adopted by the Supreme Court of Kansas:

" 'When a new trial is sought on the basis of recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial to determine. The trial judge is required to grant a new trial only when he [or she] is satisfied the recantation of the witness is true.' " (citations omitted) *Id.* 758 P.2d at 275; (quoting *State v. Norman*, 232 Kan. 102, 652 P.2d 683, 689 (1982)). *See also Thacker v. Commonwealth*, 453 S.W.2d 566, 568 (Ky.1970).

It is suggested that where a conviction rests solely on recanted testimony, a trial court must grant a motion for new trial. *State v. York*, 41 Wash.App. 538, 704 P.2d 1252, 1255 (1985). The *York* case has unusual facts and has never been applied in the State of Washington, or elsewhere, to any other factual situation. Moreover, in that case the Washington appellate court did not overrule the district court but rather upheld its discretion to grant the motion for new trial. *York* was cited by the Alabama Court of Criminal Appeals for the proposition that where the sole witness against the defendant recants, denial of the motion for new trial is an abuse of discretion. However, the statement of that rule in the Alabama case is dicta because the rule was not applied to that case, nor has it ever been applied to a case in Alabama. *Robinett v. State*, 494 So.2d 952, 955 (Ala. Cr.App.1986). The *Robinett* court cites a number of cases which allegedly support its conclusion, but upon review we discovered that none, including *York*, are accurately cited. The rule in Tennessee is that a new trial will not be granted on the basis of newly discovered evidence unless the testimony of the witness sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result at trial would necessarily follow. *State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Cr.App.1985). Quite to the contrary of the

Alabama dicta, the rule in Florida is that a new trial should not be granted on the basis of recanted testimony unless the court is satisfied that the testimony is true. *Borgess v. State*, 455 So.2d 488, 490 (Fla. App.1984). The Florida rule is essentially the same as the one we choose to adopt above. Likewise, the Indiana rule is fully consistent with our decision. The Court of Appeals of Indiana, after rejecting the concept that a recantation by a complaining witness whose trial testimony was not corroborated required a new trial, held:

> "Any contrary rule would make every judgment which was supported by a single witness dependent upon the caprice of that witness, who, once he had departed from the protection of the court, would be subjected to whatever seductions, compulsions, or guile that an unscrupulous litigant might choose to employ to rescue his ill fated cause." *Best v. State*, 418 N.E.2d 316, 319 (Ind.App. 1981).

The Alabama court relied on a Pennsylvania case which follows the same rule we adopt today. Pennsylvania rejected the concept that a recantation by a sole witness requires a new trial. "Recanting testimony is exceedingly unreliable and it is the *duty* of the court to deny a new trial where it is not satisfied that such testimony is true." (emphasis added) *Commonwealth v. McCloughan*, 279 Pa.Super. 599, 421 A.2d 361, 364 (1980). Arizona is cited by the Alabama court as a jurisdiction which agrees with its rule. However, no Arizona case has ever held as the Alabama court suggests, including the case it cited, *State v. Scanlon*, 108 Ariz. 399, 499 P.2d 155 (1972). Finally, Kentucky does not follow the Alabama dicta, but rather follows the same rule that we have adopted:

> "[T]here are special rules for situations of recanted testimony. The general rules are that recanting testimony is viewed with suspicion; mere recantation of testimony does not alone require the granting of a new trial; only in extraordinary and unusual circumstances will a new trial be granted because of recanting statements; such statements will form the basis for a new trial only when

the court is satisfied of their truth; the trial judge is in the best position to make the determination because he has observed the witnesses and can often discern and assay the incidents, the influences and the motives that prompted the recantation; and his rejection of the recanting testimony will not lightly be set aside by an appellate court." *Thacker v. Commonwealth*, 453 S.W.2d 566, 568 (Ky.App.1970).

In summary, we have found no case which clearly stands for the proposition that it is an abuse of discretion to deny a motion for new trial based upon the recantation of testimony of a sole or primary witness for the prosecution; or stated another way, the motion for new trial must always be granted where the sole or primary witness recants his or her testimony.

We will briefly address two matters which Brown has suggested as issues in his brief. The first matter is whether the district court properly made several pages of findings, including findings that it was, by training and experience, more qualified to decide an issue of this nature (credibility of witnesses) than any other judge in the state, including the members of the Wyoming Supreme Court. We would prefer that a district court not address comments directed to other members of the judiciary in its findings of facts and conclusions of law. Such comments can only serve to denigrate the judicial institutions of this state generally, and should be avoided unless there is some clear necessity therefor. We note in this case that the district court conducted an evidentiary hearing and made a reasonably detailed statement of reasons why it denied the motion for new trial. This is in accord with authorities that we consider persuasive. *See Dunbar v. State*, 522 P.2d 158, 160 (Alaska 1974). There was nothing in the district court's lengthy monologue that was even remotely prejudicial to Brown.

Brown also suggests in his brief that there was some impropriety in the district court hearing the motion for new trial when, shortly after the original criminal proceedings, the court expressed to a

juror, who made inquiry, the court's opinion that Brown was guilty beyond a reasonable doubt. In the findings, the district court clarifies that it did so only in the sense that, when this juror came to it feeling badly that she had voted to convict Brown, the court explained to her the nature of the difficult task she had to perform, consoled her, and expressed its view that it agreed the jury had reached a justified verdict—nothing more. Brown did not seek to have the district judge removed from the case or request his voluntary reassignment of the case. Moreover, he has raised no issue in this court about the matter. It is clear, in context, that Brown's purpose in introducing the evidence of the juror was only to demonstrate that the verdict was close and that this was a case where the recantation would probably make a difference in the jury verdict. There is no suggestion that there was any impropriety in what the district court did or that it decided the case on the basis of anything other than the evidence that was presented to it. There is only limited authority in existence on this question, but the authority holds that the mere fact that a judge has expressed agreement with the jury's verdict does not disqualify him from hearing a motion for new trial, though it may result in a situation where he should not sit on the new trial if one is granted on appeal. *Ingram v. Grimes*, 213 Ga. 652, 100 S.E.2d 914, 915 (1957); *Johnson v. State*, 46 Ga.App. 494, 167 S.E. 900, 900–01 (1933); *Felker v. Still*, 41 Ga.App. 462, 153 S.E. 781, 781–82 (1930); 48A C.J.S. Judges § 118, at 774 (1981). Moreover, knowledge of the defendant's past, or even a belief on the part of the trial judge that defendant is guilty, is not enough to require disqualification. The question is not if the trial judge believes defendant is guilty, but if the trial judge can be fair. *State v. Kimmel*, 202 Kan. 303, 448 P.2d 19, 22 (1968); *see Commonwealth v. Strunge*, 287 Pa.Super. 212, 429 A.2d 1176, 1178 (1981). The fair meaning of any remark made by the trial judge must be interpreted in light of the context in which it is said. The trial judge has the right to consider the legal sufficiency of facts alleged to require his

disqualification. *Shaw v. State*, 276 S.C. 190, 277 S.E.2d 140, 141 (1981), and *see Story v. State*, 788 P.2d at 621. We have held that the *bias* which is the grounds for disqualification must be personal and it must render the judge unable to exercise his function impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce. A judge has a duty not to recuse himself without a valid reason. *Cline v. Sawyer*, 600 P.2d 725, 729 (Wyo. 1979).

## CONCLUSION

We hold that the district court did not abuse its discretion in denying Brown's motion for a new trial. There is adequate evidence in the record to support its conclusion that MCX was not telling the truth when she recanted her testimony. First, she was the victim of her father's sexual depravity. Then, her mother, Lawana Brown, who, having failed to protect her daughters from the sexual depredations of their father even though she was fully aware of his inclinations from her husband's own admissions, instead heaped upon MCX her scorn and rejection. After being rejected by her mother and shuffled from foster home, to group home, to state institution, and back again, MCX did the only thing she could to endeavor to win back the affection of her mother—tell a lie and hope to free her father from prison. This case does not present an issue of whether or not MCX chooses to be a victim, for she is victim twice over, but rather whether the district court properly concluded that, in truth, she was a victim. We hold the district court did not abuse its discretion in concluding that MCX was the victim of her father's incest. To MCX we offer our empathy, for this course of proceedings is quite common in cases such as this.

Affirmed.

CARDINE, J., delivered the opinion of the court and separately filed a concurring opinion.

URBIGKIT, C.J., and THOMAS, J., filed separate dissenting opinions.

CARDINE, Justice, concurring.

In his dissent, Chief Justice Urbigkit has leveled unfounded, unjustified, serious charges toward members of this court. This concurrence issues because I am certain that we all benefit from a full, open discussion of such profound disagreements as those encountered in this case. I am compelled to concur to discuss what is a collection of misstatements, incorrect citations, inaccurate statements of law, and the accusations against this court. Thus, the majority is accused of:

1. Rejecting established judicial logic;
2. Rejecting the majority of cases;
3. Denigrating sole witness recantation
4. For the purpose of innocent person incarceration; and
5. Using an emotional word, *recanted*, rather than a supposed benign word *perjury*.

Thus, the dissent states:

"this majority casts aside a course of cases regarding motions for new trial dating back twenty-four years to the initial Wyoming case of *Opie v. State*, 422 P.2d 84 (Wyo.1967). * * * [T]he majority then rejects established judicial logic and a principle of decision found in the majority of cases to denigrate sole witness recantation in favor of potentially innocent person incarceration." Urbigkit, C.J., dissenting at p. 830.

and continuing:

"We are called to face perjury versus possible justice in the context of what Brown calls abjured testimony and the State, by emotionally impacted characterization, labels recantation. * * * A new [test for recanted testimony] creation appears from this majority's decision directed to exclude jury review and deny justice to the accused. I dissent." Urbigkit, C.J., dissenting at pp. 831–32.

We are accused of "denigrat[ing] *sole* witness recantation" in favor of innocent person incarceration. This accusation brings the fallacy of the dissent clearly into view. The dissent depends for its own credibility upon this being a case in which conviction was based upon *sole witness testimony, i.e.,* a case in which there was no other evidence of guilt. If there were other corroborating evidence of guilt, the entire premise of the dissenting opinion is incorrect, and it becomes a random meander through a supposed area of law having no relevance to this case.

If corroboration requires that a third person was present, observed, and could testify to the sexual intercourse, corroboration would be rare indeed. Obviously, such is not required. Corroborating evidence is, "[e]vidence supplementary to that already given and tending to strengthen or confirm it. Additional evidence of a different character to the same point." Black's Law Dictionary, 311 (5th Ed.1979); and *see* 9A Words & Phrases, "corroborate; corroboration," "corroborating circumstances," "corroboratory circumstances," "corroboratory evidence," "corroborative," "corroborative proof," "corroborative testimony," "corroborating proof," (1960 & 1990 Pocket Part). In *Larsen v. State*, 686 P.2d 583, 585–86 (Wyo.1984), we quoted with approval this statement from *State v. Smith*, 16 Utah 2d 374, 401 P.2d 445, 447 (1965):

"Two alternative hazards are confronted. On the one hand, in accepting the testimony of a child there is the danger that she may not be telling the truth, in which event an innocent man may be convicted of crime and suffer the consequences thereof. On the other, if the child's testimony is not accepted, a man guilty of crime, and possibly with the potential for more such, will go free. In this connection, it must be borne in mind that when such an offense is committed, it is done with the greatest possible stealth and secrecy, so that most often the testimony of the victim, coupled with the type of corroboration we have here, is the only evidence we have available upon which to determine guilt or innocence. The fact that there are difficulties involved should not prevent the processes of justice from functioning."

In *Gezzi v. State*, 780 P.2d 972 (Wyo. 1989), we affirmed a similar conviction with even less in the way of corroborating evidence. In footnote 4 of that opinion we recognized that our rule in this regard is

well within the mainstream of current American jurisprudence. In *Andrews v. State*, 529 N.E.2d 360 (Ind.App.1988), corroboration was that both female victims told similar stories, and the ten-year-old brother saw the girls leaving defendant's bedroom sweating and crying. In *State v. Moore*, 242 Kan. 1, 748 P.2d 833 (1987), corroboration was the victim's testimony concerning prior acts.

Let us examine the record for corroboration of the incestuous sex crime charges against appellant. The corroborating evidence supporting the testimony of MCX is as follows:

a. KX, a stepdaughter living in foster homes since 1985 because of appellant's prior sexual abuse, testified:

"Q. Did you—Did he ever touch you in places?

"A. Yes.

"Q. Touch you around the breasts and the vaginal area?

"A. Yes.

"Q. Okay. Did this progress on to anything more?

"A. It gradually progressed on to sexual intercourse.

"Q. Okay. How long was it—How long did this take place, this sexual contact type activity until you had intercourse with your father?

"A. Approximately two years.

\*      \*      \*      \*      \*      \*

"Q. Okay. Now, [KX], when these type of things would happen between you and your father, did he ever tell you anything about why this was happening?

"A. He would say that it would prove his love and that it was to help me in the future with sexual relations with other boys and to know what they would do."

And concerning a telephone call from MCX, KX testified:

"Q. Have you had any conversations with [MCX] about any possible or suspected sexual abuse of her by your father?

"A. Not until October of 1985.

"Q. Okay. In October of '85, you had a conversation with [MCX]?

"A. It was brief. She called me up and told me that she was leaving—was running away and my first response was why.

"Q. Uh–huh?

"A. And she told me, 'He's done the same thing to me.'

"Q. I see. And when she said, 'He's done the same thing to me,' what did you take that to mean?

"A. That he had had sexual intercourse with her."

b. Appellant, though denying sexual intercourse, testified:

"Q. Was the fondling for teaching/learning experiences?

"A. Was my fondling of her—I would have to answer that yes.

"Q. How many times did this fondling occur?

"A. There was three different occasions, I presume is what you're—three different occasions.

"Q. During these three different occasions, did you ever touch [MCX's] breasts?

"A. Once, yes.

\*      \*      \*      \*      \*      \*

"Q. Okay. What was your daughter doing at this time that made you feel that it was necessary to do that [teach her about sex]?

"A. Shortly before the first incident, she was—she had been babysitting and she'd lost her virginity.

\*      \*      \*      \*      \*      \*

"Q. I'm puzzled about this. These three incidents that you related, you did this after your daughter had lost her virginity, you state?

"A. Yes.

"Q. How old was she?

"A. Twelve.

"Q. Twelve. If she had lost her virginity, don't you think she knew what an erect penis looked like?

"A. I would presume so, yes.

"Q. Don't you think she would probably have had her breasts fondled by then?

"A. I know she had. She told me she had.

"Q. But yet you wanted to—never mind. Strike that. You stated that you talked to your wife about this; is that correct?

"A. Yes."

c. Appellant's wife L. Brown testified on cross-examination:

"Q. And do you remember me asking you if during those sessions, the Defendant admitted to having had sexual contact with his daughters?

"A. I don't remember the exact wording, Mr. Donovan, no.

"Q. But do you remember, generally, me asking you a question along those lines?

"A. Yes, I do.

"Q. And do you remember answering yes, he admitted it?

"A. I said yes.

"Q. And he has, in fact, admitted it, has he not? To you?

"A. No. The only time we've talked about it was in the counseling sessions, Mr. Donovan.

"Q. But you did state during the preliminary hearing that he had admitted it?

"A. During counseling, yes."

The above is clear, powerful corroboration of MCX's trial testimony.

The dissent next castigates the majority for referring to the victim's change of story as a *recantation*, saying the word is used as "emotionally impacted characterization." Recantation is the correct word and a legal term of art. Black's Law Dictionary, 1139 (5th ed. 1979); Webster's Third New International Dictionary, 1893 (1986). The dissent's preference for *abjured testimony* or *perjury* is incorrect. Black's Law Dictionary, 7, 1025; Webster's Third New International Dictionary, 4, 1682. At best, this can be characterized as an effort to use a euphemism where the proper word would do. At worst, it is an effort to obfuscate the issue in order to reverse an extremely serious criminal conviction.

The majority is next accused of rejecting the view of a majority of courts. Contrary to the claim that the court rejects the majority of cases, we have adopted the majority view. It is the dissent that relies upon a single California intermediate appellate court case. That case represents, at best, one view from a splintered California appellate system. *People v. Minnick*, 214 Cal. App.3d 1478, 263 Cal.Rptr. 316 (1989). In reaching a decision, which varies significantly from other similar California cases, the appeals court noted: the defendant had no prior record (not so here); the defendant consistently denied the incident (perhaps so here, but the defendant admitted to other gross improprieties and once admitted to the acts in a counseling session); there was *no* corroboration (not so here); victim changed story multiple times (not so here); and district judge could not judge the victim's credibility from personal observation (not so here). The California appeals court affirmed the trial judge's decision to grant a new trial on the basis that it was an expression of the court's sound discretion. We here also affirm the trial judge's decision as an exercise of sound discretion, except here it was a denial of a new trial motion. We affirm that decision because, like the California court, we find no abuse of discretion.

The distinction the dissent makes between credibility and truthfulness of a recanting witness is not supported by the cases cited. *Ahvakana v. State*, 768 P.2d 631 (Alaska App.1989) is cited for the proposition that "[i]f the events are definitive, credibility is lacking." Urbigkit, C.J., dissenting at p. 849. In this case, however, the witness told the defendant's attorney that he lied at trial; but at a hearing, under oath, the witness reaffirmed the defendant's guilt and testified that he lied earlier because he feared prison inmates would beat him up. 768 P.2d at 632. The Alaska court held that "courts do not hesitate to deny a new trial" in such circumstances. *Id.* at 633.

The dissent then cites three cases for the proposition that "[i]f the changed testimony in itself denies belief, credibility is also lacking." Urbigkit, C.J., dissenting at p. 849. The first case cited, *State v. May*, 227 Kan. 393, 607 P.2d 72 (1980), has nothing to do with witness recantation or new trial motions. The only thing close to something on point in this case is its holding that a judge may consider the falsity of a defendant's testimony in making a sentence determination. 607 P.2d at 77.

In *State v. Estrada*, 537 A.2d 983 (R.I.1988), the appellate court found that the trial court did not need to reach the credibility of the recanted testimony. Thus, any inference drawn from this case can be considered dicta.

The last case cited speaks of truthfulness, not credibility, of a witness when it states:

> " 'Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is *true.*' " (emphasis added) *Bell v. State*, 90 So.2d 704, 705 (Fla.1956) (quoting *Henderson v. State*, 135 Fla. 548, 185 So. 625, 630, 120 A.L.R. 742 (1938)).

Next expressed is a concern that this case will overrule *Lacey v. State*, 803 P.2d 1364 (Wyo.1990). Although *Lacey* does state that the district court concluded the witness' "recanting testimony lacked sufficient credibility to warrant a new trial," *Id.* at 1369, we continued stating "[t]hat conclusion clearly implies that the evidence was insufficient for the court to conclude that the testimony given at the trial was *false.*" (emphasis added) *Id.*

From the dissent's roving review of supposed law, one might divine the debate presented is whether the test for judging recanted testimony should be:

a. Is it *truthful;* and if truthful, *might* it change the outcome of the trial?

or

b. Is the witness *credible;* and if credible, will it *probably* affect the outcome of the trial?

I note, borrowing a dissent citation, that

"The tests seem equally exacting; the difference is that *Berry [v. State*, 10 Ga. 511 (1851) ] is more demanding regarding the probative value of the recantation while *Larrison [v. United States*, 24 F.2d 82 (7th Cir.1928) ] emphasizes the credibility of the witness. Hence, the two tests in actuality may present nearly equivalent hurdles to a defendant requesting a new trial." Comment, *Gary Dotson as Victim: The Legal Response to Recanting Testimony*, 35 Emory L.J. 969, 978 (1986).

The author of the Emory Law Journal article in effect says there is no real difference between the two tests. At first blush, it would seem that if the judge found the witness credible, it would be because he believed her; and if he believed her, it was because he was of the opinion that she was testifying truthfully. If he found her not credible, could it be he believed she was not testifying truthfully? What would be the result should we remand this case for further proceedings consistent with this opinion? I have no doubt the judge, having found the witness untruthful, would surely find the witness not credible. The result would be denial of the new trial motion—the same—how come?

W.R.Cr.P. 34 places in the trial court the authority to grant a new trial if "required in the interest of justice." *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928), recognized the duty of the trial court to judge truth and, commenting upon the policy factors present, stated:

> " 'But if, on the contrary, he (the judge) was convinced that the second testimony was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumphant. He was charged with the responsibility to seek the truth himself.' " *Id.* at 88 (quoting with approval *People v. Shilitano*, 218 N.Y. 161, 112 N.E. 733 (1916)).

The test then adopted for ruling on new trial motions was stated in *Larrison* as:

> "We shall approach this question on the assumption that a new trial should be granted when,
>
> "(a) The court is reasonably well satisfied that the testimony given by a material witness is *false*.
>
> "(b) That without it the jury *might* have reached a different conclusion.
>
> "(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." (emphasis added) *Id.* at 87–88.

This court no more casts aside 24 years of cases beginning with *Opie v. State*, 422 P.2d 84 (Wyo.1967), than does the dissent. We simply add to the *Opie* test an additional requirement when the newly discovered evidence is recanted testimony. The dissent would also add an additional requirement to *Opie* when it states, "the proper approach in these kinds of cases and particularly when related to recanted testimony should address the foundational basis first to assess *credibility* * * *." Urbigkit, C.J., dissenting at p. 849. It is eminently unfair to acknowledge the need for an additional requirement to *Opie*, and then point an accusatory finger at the majority, suggesting that we cast aside 24 years of precedent when, if true, the dissent also proposes to cast aside the same 24 years of precedent.

Next it is said that Brown got further than *Story v. State*, 788 P.2d 617 (Wyo. 1990), "in part because of the adamancy of this writer's opinion." Urbigkit, C.J., dissenting at pp. 832–33. The apparent meaning of the self-serving statement is that Brown was given a hearing that Story was denied because of the writer's opinion in Story. Credit is taken where no credit is due. Of this I am certain. This judge was not driven to granting a hearing because of something the "writer" wrote. A hearing was provided because a hearing was appropriate.

We note that the dissenter here has dissented frequently in cases such as this, espousing rules which would establish such an onerous standard of proof that virtually all incest/indecent liberties cases would be impossible to prove. *Monn v. State*, 811 P.2d 1004, 1011 (Wyo.1991) (Urbigkit, C.J., dissenting); *Gale v. State*, 792 P.2d 570, 590 (Wyo.1990) (Urbigkit, J., dissenting); *Zanetti v. State*, 783 P.2d 134, 139 (Wyo. 1989) (Urbigkit, J., dissenting); *Gezzi v. State*, 780 P.2d 972, 978 (Wyo.1989) (Urbigkit, J., dissenting); *Bryan v. State*, 745 P.2d 905, 910 (Wyo.1987) (Urbigkit, J. dissenting); *Brown v. State*, 736 P.2d 1110, 1117 (Wyo.1987) (Urbigkit, J., dissenting); *Stewart v. State*, 724 P.2d 439, 443 (Wyo. 1986) (Urbigkit, J., dissenting).

The dissent would have us disavow the long-established rules followed by this court and a vast majority of other jurisdictions. The result of the views expressed in this dissent, when read in combination with all the other dissents, would quite simply be that child sexual abuse would become unprosecutable except under the rarest of circumstances. Such a course of action as that espoused by the dissent would, indeed, prevent the processes of justice from functioning.

Succinctly stated, this is just another sexual abuse of minors case the dissenting justice would reverse for reasons having no basis in fact or law.

URBIGKIT, Chief Justice, dissenting.

It is hard enough in concerned adjudicative responsibilities to comprehensively face a case of perceived denied justice one time, *see Cooney v. Park County*, 792 P.2d 1287 (Wyo.1990) and *Gale v. State*, 792 P.2d 570 (Wyo.1990), let alone to return to it a second time. After *Brown v. State*, 736 P.2d 1110 (Wyo.1987) (*Brown I*), we corrected the adjudicative error in *Zabel v. State*, 765 P.2d 357 (Wyo.1988), but we now compound that miscarriage of justice by disregard of what actually happened in the second proceeding as *Brown II*.

Substantively, in the guise of providing

guidance,[1] this majority casts aside a course of cases regarding motions for new trial dating back twenty-four years to the initial Wyoming case of *Opie v. State,* 422 P.2d 84 (Wyo.1967). Upon finding a way to essentially render the Wyoming rule, W.R.Cr.P. 34, on granting a new trial in a criminal case inoperable by adding a further restriction on the *Opie* rule, the majority then rejects established judicial logic and a principle of decision found in a major-ity of cases to denigrate sole witness recan-tation in favor of potentially innocent per-son incarceration.

The scanty strands of straw created from existing precedent or logical concepts provided in the majority as a bed for this new concept advances little authentication for approval or acceptance. Neither Brown nor the State in brief or argument supporting testimonial admission suggest-ed that this court adopt this hybrid muta-tion of the *Larrison–Berry* historical an-cestry. *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928); *Berry v. State,* 10 Ga. 511 (1851).

The call to this second session was antici-pated by the dissent in *Brown I.*[2] We again deny resort to procedural justice for the accused whether or not he is guilty as once claimed by his daughter and long since now consistently denied (recanted).

We are called to face perjury versus pos-sible justice in the context of what Brown calls abjured testimony and the State, by emotionally impact characterization, labels recantation. The standard Wyoming test, as tough as it may have been derived from *Opie,* 422 P.2d 84, is misconstrued by mis-application. The comparable *Larrison* test, although rejected at trial, is now sub-stituted for decision justification by muta-tive application. A new creation appears

from this majority's decision directed to exclude jury review and deny justice to the accused. I dissent.

I.

FACTS AND TRIAL EVENTS

As chronicled in *Brown I,* 736 P.2d 1110, there were two daughters—K.B., the old-est, a stepdaughter who had been adopted by Brown, and M.C.X., who was his natural child. The theory of defense in the first case was that after admitting abuse prob-lems with the older child, K.B., and the younger child at an earlier date, the present offense was fabricated by M.C.X. for which prosecution was pursued as re-venge and for M.C.X. to escape from the home.

The present record contains the juvenile proceedings for both children which com-menced in approximately 1984 and moved then to this proceeding by M.C.X. with an allegation about a specific offense. The sexual abuse was alleged to have occurred on Monday, the afternoon of August 12, rather than August 5 as ascribed in testi-mony at the preliminary hearing. M.C.X.'s third choice was August 19. It was unreal-istic, if not impossible, for the charged of-fense to have occurred during any one of those three times. Nevertheless, Brown, based solely in substance upon the testimo-ny of M.C.X., was convicted in March 1986 and the resulting sentence was affirmed with one special concurrence and two dis-sents by this court in May 1987.

M.C.X. was removed from the family in 1985 and, from a time after the judgment was affirmed until she enlisted in the Navy in 1987, she went from pillar to post in the juvenile domiciliary of almost innumerable placements, including the female juvenile

---

1. When any majority opinion affirming a crimi-nal conviction speaks about enlarging a rule and providing guidance, it is reasonably guaran-teed that an unbriefed attack on constitutional or established individuals rights and protection is intended. This is what occurs here. *See McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517, *reh'g denied* —— U.S. ——, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991).

2. The broad subject of bias, prejudice and pre-determination involving the decision on the mo-tion for a new trial was not initiated by appel-late briefing or defined oral argument. This subject comes into this decision as a volunteer *discussion with analysis which is unacceptable* to this writer and it will be comprehensively considered in Section V of this dissent. *See* 1990 Wyoming Code of Judicial Conduct adopted December 12, 1990, effective March 12, 1991.

confinement facility in Sheridan, Wyoming. Sometime before a juvenile disposition hearing in May 1988, she had made known that she wanted to recant her trial testimony in stating that it had not been true. At a hearing in May 1988, she specifically repeated that statement directly to the trial judge, the same judge who thereafter determined this motion for a new trial and documented his determined disbelief. Her desire to abjure the stated perjury used for conviction continued with consistency and, following Navy enlistment to get away from the juvenile court placements, she supported her change in testimony by execution of an affidavit asserting she had given false testimony at trial. Supporting the motion for a new trial at the resulting hearing was the expert witness evaluation of Dr. Brian Miracle, a clinical psychologist. M.C.X.'s testimony at the hearing was specific, direct and emphatic and, as in 1986, 1988 and now following the hearing in 1989, unaccepted by the trial court.

At the hearing held on June 21 and 22, 1989, the trial court, in a transcript recorded in a twenty-page monologue covering a multitude of subjects, reiterated in essential conclusion what had been said in the closed juvenile proceeding fifteen months earlier. The trial judge did not believe M.C.X. had originally committed perjury, but rather was lying at this later date. Unfortunately, neither Brown nor his counsel were present at the 1988 juvenile disposition hearing to know that the trial judge had already made up his mind regarding the validity of the original testimony before conducting the subsequent hearing on the motion for a new trial. Adding additional substance to the expressed bias of the trial judge was a colloquy that had occurred between himself and an initial juror when, at a time after the original verdict, he comforted the juror by assuring her that Brown was in fact guilty.

## II.

### INTRODUCTION OF ISSUES PRESENTED

The basic problem with the facts of this case was that within reason, the offense could not have occurred on the date specifically charged of August 12 or even August 5 or August 19, which were variable dates claimed by the alleged victim. Either the occurrence did not happen at all or it happened on some other unrelated date. Initial conviction was obtained by the use of an "expert" witness who vouched for the credibility of the complainant, *cf. Zabel*, 765 P.2d 357, and a course of bad acts evidence involving an earlier occurrence with an older daughter for which Brown had previously been subjected to criminal punishment. *Brown I*, 736 P.2d 1110, Urbigkit, J., dissenting.

The major technical problem with the majority is that it does not apply the *Opie* test at all and, if it had, the trial court decision, biased as it was, would have required reversal. The majority now seeks to append to a recanted testimony test such as *Opie* a new condition that requires the trial court to find truth in fact in recantation instead of reasonable credibility. The test creates an impossibility unless the trial judge is a mind reader. Obviously, if the trial court was not smart enough to realize that the prior version was possibly in error, it can no easier be provided a new test of assessed validity which in practical effect simply destroys the efficacy of the motion for new trial process where perjured witness testimony is considered.

We move from a situation where we had one witness asserting the event actually occurred, an expert witness who just asserted and a number of witnesses who opined to the contrary by specific factual recitation of impossibility. Now we have no witness to say it happened, but this majority seems determined to preserve the conviction. Unfortunately, we are also faced with a documented record where the trial judge had made up his mind before the hearing was held for *Brown II*.

The communicative capacities of the written language to advise or mischaracterize are a miracle to behold. The majority presents this case through the emotionally directed word "recanted," where the real inquiry is a simple question of perjury. The more specific question is whether or

not an innocent man was incarcerated by perjury of a principal witness. How do you know the question exists? That witness now states that her original testimony was perjured. In restructuring the case, the majority ignores a significant fact and, in the process, the entire thesis upon which the case was originally tried. At the preliminary hearing, the complainant testified that the offense was a specific offense and occurred on a certain date. Finding thereafter that the date could not have been correct because the family was not even in the state, a further date was selected which had more opportunity since it involved a scheduled time when the mother would have been out of the house for some period.

Realistically examining the testimony itself, it is clearly apparent that the offense could not have occurred on that date either. If it could not, it did not. The burden of the testimony is absolute in that regard except for one small voice, the complainant. That person who had the last voice now agrees that it did not occur on the date stated. Like *Gale*, 792 P.2d 570, where a principal witness was in two places at the same time, this event as subjected to evidence of determined guilt did not occur.

The majority broadens this case by leaving open an offense that may have occurred at some other time which is not the subject of this prosecution. Obviously, Brown was convicted by bad acts testimony and the wisdom of an expert who devined the credibility of the complainant. For hard evidence of guilt, there was only one witness and now that witness says the facts were not true. I take strenuous issue with the majority in abandoning *Opie*, 422 P.2d 84, as stringent as it was and inflexible as it has been applied, to now add a further factor to justify affirming when the last available witness no longer supports the verdict and decision.

This court is again called to act like a superannuated jury to determine not the fairness and propriety of the vehicle utilized, but rather to make a fact finding decision. In this case, that fact finding is not that the witness probably lied during the original trial, but rather what she says now is true. The falsity of trial testimony is unaddressed and a characterization is applied to what we think of the present recitation. The issue of this case is relatively simple. Does the law have a mechanism so that perjured testimony will not be the vehicle for conviction and incarceration? Is error in the system non-correctable because the system and its participants are unable to admit that a mistake ever occurs? This result was the vice of the use of reputation and bad acts to convict as exasperated by an expert who, in result, testified as to the credibility of a witness. We corrected that error in *Zabel*, but continue to ignore its participation in *Brown*.

Perjury is a major problem in criminal procedure recantation since testimony originally was either correct or now corrected. One time or another, perjury was committed. The problem of perjury is not new since Sir Walter Raleigh came to know its true content when he was charged, convicted and then hung based on false identification and perjured testimony. Brown got further than *Story v. State*, 788 P.2d 617 (Wyo.), *cert. denied* —— U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 76 (1990) in part because of the adamancy of this writer's opinion, although not to succeed, but the fact remains that the right to assess evidence and test empirical validity should remain within the criminal jury and not displaced by trial court or appellate tribunal.

### III(A).

### THE *LARRISON–BERRY* ALTERNATIVE TESTS— GENERALLY USED

The majority decision abandons the historical standard followed by this court after adoption in *Opie* called the *Berry* rule [3]

---

3. *Berry*, 10 Ga. at 527 states:

Upon the following points there seems to be a pretty general concurrence of authority, viz: that it is incumbent on a party who asks for a new trial, on the ground of newly discovered evidence, to satisfy the Court, 1st. That the evidence has come to his knowledge since the trial. 2d. That it was not owing to the want

by creating in part a hybrid *Berry* concept and, in part, a mutation of *Larrison*, which this court has at least in recent years refused to accept.[4]

*Berry* is identical with *Opie* and is generally differentiated by its criteria of *probable* effect on the jury verdict, while *Larrison* in that regard sets the criteria as *"might* have reached a different conclusion." *Larrison*, 24 F.2d at 87. The examination perspective is different since *Berry* considers a future jury while *Larrison* contemplates what the prior jury might otherwise have done. At least within the scope of a multitude of succeeding cases, the overt difference is the *might* concept of *Larrison* compared to the *probable* concept of *Berry*. The system difference is fact finding: assumed by the trial court to determine the ultimate issue or retained for trial jury to resolve.

This difference between *Berry* and *Larrison* does not, however, define what has occurred in the mutative hybrid now created by this court. There is what I would contend to be a preliminary examination required of the trial court to answer a motion for a new trial on the basis of newly discovered evidence, whether recanted testimony or otherwise. Involved in first consideration is the circumstance and textual validity and credibility of the newly addressed evidence to justify first a hearing or then a new trial.

*Berry* in itself did not establish an evidentiary or process standard within the criteria for a new trial except as to the conditions relating to the nature of the trial process, e.g., material, not accumulative or newly discovered; none of which really addressed the question of intrinsic credibility and validity. As *Berry* has developed, the concept emplaced has been reasonable credibility of the new testimony considering both circumstance and text. This criteria is especially applicable to recanted evidence because of the variant nature of perjury then, now or both times.

*Larrison* to the contrary, although not directly stated, came to stand for a test of validity which directed itself to the original testimony—"[that] the court [be] reasonably well satisfied that the testimony given by a material witness is false". Comment, *Gary Dotson as Victim: The Legal Response to Recanting Testimony*, 35 Emory L.J. 969, 975 (1986) (quoting *Larrison*, 24 F.2d at 87–88).

An additional difference in the two standards is the extent of knowledge of the evidence which the judge must impute to the jury in determining whether to grant the new trial motion. It has been suggested that many cases implicitly recognize that in determining whether the *Larrison* "might" standard is met, a judge must consider whether a different verdict might result if the recanted testimony was eliminated altogether from the jury's consideration. In other words, the hypothetical jury to which the judge makes reference would have no knowledge whatsoever of the testimony which was later recanted. On the other hand,

---

of due diligence that it did not come sooner. 3d. That it is so material that it would probably produce a different verdict, if the new trial were granted. 4th. That it is not cumulative only—viz; speaking to facts, in relation to which there was evidence on the trial. 5th. That the affidavit of the witness himself should be produced, or its absence accounted for. And 6th, a new trial will not be granted, if the only object of the testimony is to impeach the character or credit of a witness.

**4.** *Larrison* was initially addressed to a confined area of newly discovered evidence recanted testimony, but in general fashion has expanded its scope in application so that *Berry*, encompassing a general rule, included recanted testimony and *Larrison*, which was a more defined rule, has now expanded generally to be a compara-

tive principle to *Berry* involving a motion for a new trial based on newly discovered evidence. The *Larrison* rule originally stated:

> We shall approach this question on the assumption that a new trial should be granted when,
> (a) The court is reasonably well satisfied that the testimony given by a material witness is false.
> (b) That without it the jury *might* have reached a different conclusion.
> (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Larrison*, 24 F.2d at 87–88 (emphasis in original).

in determining whether the "probability" standard of *Berry* is met, the judge assumes that this hypothetical jury has before it both the original testimony and the later recantation. The distinction between the two tests apparently flows from the language used in *Larrison's* second requirement: "[t]hat *without it* [the original testimony] the jury *might* have reached a different conclusion." This difference is a notable one, in that the *Larrison* test places full responsibility for the determination of the credibility of the witness's recantation with the judge rather than with the jury. While *Berry* suggests that the hypothetical jury would have before it precisely the same evidence, including the recantation, that is before the judge, and hence might choose to believe or disbelieve the witness, *Larrison's* elimination of *all* of the controverted testimony from the jury's consideration has the effect of taking the choice from the jury. Although the determination of credibility is traditionally left to the jury, *Larrison* thus places it entirely within the judge's province. *Berry*, on the other hand, leaves the final determination with the jury, but nonetheless requires the judge to make a preliminary evaluation of credibility, in that the motion is to be granted *only* if the judge finds it probable that the jury will reach a different result on retrial. Implicit in a ruling on that probability is a determination of whether the jury is likely to believe the witness.

When the two tests are analyzed in this manner, it becomes evident that the greater "leniency" of the *Larrison* test may be more illusory than real. *Larrison* does provide a less demanding standard that does *Berry*—"might" versus "probable"—regarding the degree of certainty that a judge must have in the likelihood of a different result on retrial. But this "easing" of the standard is

counterbalanced by *Larrison's* further requirement that the judge first be convinced of the truthfulness of the recantation. *Berry*, conversely, appears to require more certainty that a different result would ensue, but does not require that the judge be as sure of the truthfulness of the recantation. The tests seem equally exacting; the difference is that *Berry* is more demanding regarding the probative value of the recantation while *Larrison* emphasizes the credibility of the witness. Hence, the two tests in actuality may present nearly equivalent hurdles to a defendant requesting a new trial.

*Id.* at 977–78 (footnotes omitted and emphasis in original).[5]

In practical usage within the case law, and particularly so where the *Larrison* "reasonably satisfied" concept has now been converted as is in this case to an "is true" concept, is the emplaced function of court and jury in the decisional process. Credibility in *Berry* is not so far removed from the concept of summary judgment and directed verdict while the "reasonably satisfied" or "is true" concept of *Larrison* contemplates a subjective examination by the trial court to make a determinative finding of fact.

With a somewhat reasonable equivalency in operation, although obviously differing in effect on specific factual circumstances, *Berry* defined "credibility and probable" effect and *Larrison* defined "reasonably true" and "might" effect. This court takes the "probable" effect from *Berry* and the trial court finding of "true" from *Larrison* as a hybrid. In result, the jury function is erased and for the new trial to be granted, the trial court has to determine contrary to the prior verdict that in fact the accused should be acquitted under the present status of newly presented evidence. In particular, in a recanted evidence case, the re-

**5.** The *Larrison* concept as originally stated with its *might* effect the jury considered the original testimony for "reasonably well satisfied that the testimony given by a material witness is false" analysis. *Larrison*, 24 F.2d at 87. This court now restates with the *probable* effect and then alters *Larrison* posthumously to require "is satis-

fied the recantation is true." We move from reasonable satisfaction that the past testimony was false to the new creation of determination by the trial court that the present testimony is true. The test is changed from retrospective to prospective for trial court fact finding.

sulting effect is to deny any access, except in a millennium kind of case, for a right to a new trial based on perjured evidence. The boundaries of application are drawn to destroy the remedy which was explicitly provided by this court's rules of procedure. The present majority opinion is not a grant of new trial issue review, but instead constitutes a decision mandating automatic rejection of any application for a new trial. The reasonable opportunity of the jury to reassess guilt in the context of the recanted evidence is also foreclosed. Tiersma, *The Language of Perjury: "Literal Truth," Ambiguity, and the False Statement Requirement,* 63 S.Cal.L.Rev. 373 (1990).

The recanted cases have a particular nastiness because of the embedded perjury—one time or another. By the overreaching mistake now made, this majority attacks the entire concept of our rules for new trials, W.R.C.P. 59(a)(7) and 60(b) and W.R.Cr.P. 34, where contended injustice has occurred and particularly because of infliction of perjury into the process. By this action, the majority abandons its historical and constitutional requirement relating to the jury fact finding responsibility by the perversion of that power and responsibility through assignment instead to the trial court. In my personal persuasion, I would find this approach to also excuse and accommodate perjury which, by all expert analysis excluding only performance of counsel, stands as the most pervasive obstruction to the adequate operation of the justice delivery system.

The case law on the subject of motions for a new trial based upon newly discovered evidence is astronomical, with some thirty or more Wyoming cases included. Wyoming, now for the first time in this case, posits itself almost totally alone or perhaps two other states where, with close examination, we find that the citations of authority in the majority neither fit into the body of national law nor accord with this state's historical precedent. *Absolutely no prior Wyoming case utilized the test now adopted which is best characterized as a Larrison–Berry hybrid mutation.*

III(B).

## LOGICAL AND PRECEDENTIAL INVALIDITY OF WHAT THIS CASE NOW DOES.

Lacking any support in Wyoming precedent for the *Larrison–Berry* mutation rule combining criteria of probable effect and trial court determined validity (or invalidity), I look at the foreign jurisdiction citations presented by the majority for authority. As the majority emphatically justifies, it "will enlarge on that general rule [of *Opie* ] somewhat to provide additional guidance in cases, such as this, which involve recanted testimony." Restated for this case, it means a result-oriented decision for Wyoming law. It also provides assurance that Wyoming rules of civil and criminal procedure providing for a new trial with newly discovered evidence are desecrated and particularly so when perjury is involved.

The practical concepts advanced herein by this majority are that it is preferable to countenance perjury than to disturb stability and finality; fact finding should be limited to the trial court when witness misconduct is contended. That decisional responsibility is not extended to jurors who apparently are considered to be too incompetent to recognize who are liars and what are lies within the inter-reactions of human beings to emotional stress, crisis and criminality. This court departs from adjudicative norms which comprise proper appellate processes and, without even a modest admission that it discards the longstanding Wyoming law to act without compelling briefing or compatible argument having been provided, now radically rewrites by activist decision the very basic application of our rules of civil and criminal procedure.

Cited for this foray to change existent law are three cases from Montana, Kentucky and Pennsylvania to authenticate a determined true rule. Following are several cases which attack a corollary but completely different principle involving the confined subject of recantation when conviction is based solely on the recanted testimony. These cases, normally sexual assault

cases but not entirely as we shall see, form a definable group within the larger category of recanted or perjured testimony cases. The majority adopts a minority view in first justification for this mutation rule, which is different from the three cited cases, and then misapplies authorities on the subject of conviction based solely on the perjury class of cases. Neither explanation nor justification for changing the longstanding Wyoming law is provided in the opinion for discussion.

I will first look at the established test, "to be true (or untrue) application," and then examine in detail whether need is demonstrated to change Wyoming law for this decision. Then in organizational approach, it is necessary to look at the national division between the *Berry* rule states compared to the *Larrison* jurisdictions and recognize the conflicting but reconcilable concepts of the rejection of conviction and grant of a new trial in order to deny enforcement of perjury while maintaining reasonable stability by the application of an initial credibility criteria which has served heretofore as a standard in this jurisdiction.

In *State v. Perry*, 232 Mont. 455, 758 P.2d 268 (1988), the 1971 second degree murder conviction was reconsidered in a 1987 new trial proceeding. The original conviction resulted from testimony of an admitted co-participant in the rape/murder incident. Fifteen years after the first trial, the co-participant changed his story, recanted and accepted sole responsibility for the homicide. The opinion notes that the defendant had not testified in the original trial. Not surprisingly, in view of the significant evidence to the contrary, the trial court and the supreme court refused to accord credibility to the recanted testimony and denied a per se validity test for granting a new trial. The Montana court then combined two concepts—abuse of discretion and satisfaction that the recantation of the witness was true.

The court said:

[T]o grant a person of questionable credibility and motive carte blanche to overturn the determination of a jury operat-

ing within the bounds of our constitutional protections is not conducive to the sound administration of justice.

*Id.* 758 P.2d at 275. What *Perry* really presents is a credibility review mischaracterized as a trial court ultimate validity determination.

In *State v. Miller*, 231 Mont. 497, 757 P.2d 1275 (1988), the court made clear that the jurisdiction followed the *Berry* test of a "probable different result." *Miller* likewise applied the conventional *Berry* examination of reasonable credibility. Consequently, *Perry* reflected only a misuse of language and a limited analysis of new trial-recanted evidence concept. I see no reason why we should follow that mistake which the present majority and an earlier Montana case attribute to a Kansas case, *State v. Norman*, 232 Kan. 102, 652 P.2d 683 (1982).

The *Norman* case involved a sordid felony murder of a female convenience store attendant. In that case, the court concluded "[t]he trial court believed the jury returned a reasoned verdict not based solely on Tyler's testimony and gave the recantation little credibility." *Id.* 652 P.2d at 689. The documentary development reflected in the opinion provided no support for credibility since no direct sworn evidence of recantation was documented. The case was a credibility review with truthfulness not directly presented in the process of the record development *for the case.* The basic Kansas case was *State v. Green*, 211 Kan. 887, 508 P.2d 883 (1963), where the test was credibility and not validity. *Green* was followed by *State v. Watie*, 223 Kan. 337, 574 P.2d 1368 (1978), which was used in the following case of *Norman.* In *Watie*, 574 P.2d at 1376, the court recited that it was "satisfied the recantation of the witness's testimony [was] true" (not that the recanted statement was true), but then the court affirmed denial of the motion for new trial as to two robbery participants and reversed as to another by statement:

Further, Linda Beasley Heard's own attempts to introduce evidence of Linda Lewis' recanting statements, together with attempts to introduce the allegedly

inconsistent statements made by the witness to her mother were all denied by the trial court. Taken individually these points do not merit reversal, but in view of the meager evidence against Linda Beasley Heard and the cumulative effect of the rulings of the trial court adverse to her, we hold the trial court committed prejudicial error in failing to grant a new trial to the appellant Linda Beasley Heard, and her conviction must be reversed.

*Id.*

This course of Kansas cases, although authoring and affording apparent authority for the challenged statement of "satisfied the recantation is true," were in reality fact and circumstance analysis in every case addressing credibility in practical fact as best illustrated by *Watie* with part reversal and part affirmation based on the same coparticipant recanted testimony. Unfortunately, the authors in the opinion were not called to closely examine the difference between jury fact finding and judicial supervision.

Case law from the third state cited to provide additional authority used to justify this new Wyoming *Larrison–Berry* recantation truth or validity comes from *Thacker v. Com.*, 453 S.W.2d 566 (Ky.1970). The Kentucky case was premised on facts and circumstances in what was in result a credibility review. Reference is made in the opinion to two earlier Kentucky cases where denial of a motion for new trial on recanted evidence was in fact reversed on appeal which supports the analysis of a fact and circumstance credibility review. *Mullins v. Com.*, 375 S.W.2d 832 (Ky.1964) and *Shepherd v. Com.*, 267 Ky. 195, 101 S.W.2d 918 (1937) used a credibility analysis sufficient to justify jury review and not a finite trial court fact finding episode. Additionally, both *Mullins* and *Shepherd* were cases where all of the principal witness testimony was directly addressed in the recantation.

Within the entire body of law from all jurisdictions, the majority for this court has only presented this foreign jurisdiction precedent to support a change in the histor-ical Wyoming law. Next, the majority attacks a corollary principle as a separate subject involving cases where the sole witness recants. The overwhelming body of case law is contrary to this present decision on both subjects.

## IV.

## PROSECUTION BASED ON THE SOLE WITNESS WHO LATER RECANTS— A CREDIBILITY, FACT AND CIRCUMSTANCE STANDARD

The case which defines and highlights the conceptual problem directly involved here is *People v. Minnick*, 214 Cal.App.3d 1478, 215 Cal.App.3d 293A, 263 Cal.Rptr. 316 (1989). That court first recognized discretion and a requirement that each case be examined on its own facts and then answered by absolute rejection of the contention of the state that "the trial court is required to determine whether the witness's recantation is true or false in ruling on a motion for new trial. If false, the motion must be denied; if true, it must be granted." *Id.* 263 Cal.Rptr. at 318. The court emphatically chose a different standard justified in basic jury fact finding concepts:

> The role of the trial court in deciding a motion for new trial based upon a witness's recantation is to determine whether the new evidence is credible, i.e., worthy of belief by the jury. That determination is made after a consideration of all the facts pertinent to the particular issue. *The trial court is not the final arbiter of the truth or falsity of the new evidence.*
>
> Once the trial court has found the recantation to be believable, it must then decide whether consideration of the recantation would render a different result on retrial reasonably probable.

*Id.* (emphasis added). For an identically stated standard, see *Lombardo v. State*, 172 Conn. 385, 374 A.2d 1065 (1977); *State v. James*, 490 So.2d 616, 620 (La.App.1986); and *State v. Volpato*, 102 N.M. 383, 696 P.2d 471 (1985). *See also Solis v. State*, 262 So.2d 9, (Fla.App.) *cert. denied* 265

So.2d 372 (Fla.1972), which was superseded by *Mollica v. State*, 374 So.2d 1022 (Fla. App.1979), *cert. denied* 386 So.2d 639 (Fla. 1980) on the issue of exercised discretion.

This is precisely the standard that existed in Wyoming prior to the intervention of the present majority opinion which now enlarges trial court decisional discretion with a fact finding requirement of truthfulness.

The statement of this confined factual situation rule involving principal witness recantation is provided in 4 Wharton's Criminal Procedure, § 601 at 189 (12th ed. 1976) (footnotes omitted):

> Ordinarily, a new trial will be granted where the conviction was based primarily on the testimony of such prosecuting witness [who recanted]; a new trial will be refused where the conviction was sufficiently supported by other evidence, where the recantation was obtained by coercion, or where the recantation was subsequently repudiated.

The principal case presently cited and directly attacked in this majority is *State v. York*, 41 Wash.App. 538, 704 P.2d 1252 (1985). Perhaps the misunderstanding by this majority of the *York* sole witness rule for a new trial after the witness recants comes from confusion of the subject and its intrinsic factors. First is that the recanted testimony process provides reasonable credibility (e.g. not double recant or Fifth Amendment refusal to testify at hearing). Secondly, the recanted testimony must be essentially the basis of the original conviction and other collaboration and supporting evidence was not available to now adversely test credibility of the recanted posture taken.

*Brown II* now provides a classical *York* case where there was no supporting evidence to demonstrate that the criminally charged act ever occurred; the sole witness recanted testimony under oath at a hearing and the witness provided an established history of consistency since trial in asserting that the trial testimony was false. Similarly, *York* was an indecent liberties case, there was no supporting evidence the offense had ever occurred and the complaining witness recanted shortly after trial and maintained the same position through sworn testimony at a new trial hearing.

In reversing the trial court denial of a new trial, the Washington court stated five preliminary criteria and conclusionary effect creating the recanted witness test:

> We now address whether the court erred in finding that defendant's conviction was based "solely" upon the recanting witness' trial testimony, and refusing to find whether this witness had perjured herself at the trial.
>
> On a motion for a new trial based upon newly discovered evidence, the following five requirements must be met before a new trial will be granted: (1) the evidence must be such that the results will probably change if a new trial was granted; (2) the evidence must have been discovered since the trial; (3) the evidence could not have been discovered before the trial by exercising due diligence; (4) the evidence must be material and admissible; and (5) the evidence cannot be merely cumulative or impeaching. *State v. Williams*, 96 Wash.2d 215, 223, 634 P.2d 868 (1981); *State v. Davis*, 25 Wash. App. 134, 138, 605 P.2d 359 (1980). * * *
>
> Where independent evidence corroborates the testimony that a witness later seeks to recant, the grant of a new trial rests within the sound discretion of the trial judge. *State v. Rolax*, 84 Wash.2d 836, 529 P.2d 1078 (1974); *State v. Hayden*, 28 Wash.App. 935, 627 P.2d 973 (1981). However, "[w]hen a defendant is convicted *solely* on the testimony of the now recanting witness, this court has squarely held that it is an abuse of discretion not to grant a new trial." *State v. Rolax*, 84 Wash.2d at 838, 529 P.2d 1078, citing *State v. Powell*, 51 Wash. 372, 98 P. 741 (1909). Here, in granting the motion for new trial, the trial court found that defendant's conviction rested solely upon the testimony of Louise and that her recantation met all of the five criteria of *State v. Williams*, *supra; State v. Davis*, *supra.*

*York*, 704 P.2d at 1254–55 (emphasis in original). The precise principle is also to be

found in *Mullins,* 375 S.W.2d 832 and *Shepherd,* 101 S.W.2d 918. Actually what is sometimes called the *York* rule in Washington state law should more properly be designated the *Powell* principle derived from *State v. Powell,* 51 Wash. 372, 98 P. 741, 742 (1909), where it was stated: "Outside of the evidence of this girl there is no evidence of the offense to submit to the jury." The court then said:

> The jury at the trial did not have the fact before it that the witness had made sworn statements contrary to her testimony. The witness made such sworn statements afterwards. It is true she testified that she had stated when not under oath that she had never had sexual intercourse with the appellant, but it is not uncommon for persons to deny such things when not under oath, and afterwards, when they are on oath, admit the fact. Such witnesses may be worthy of belief, but it is rare that any person will testify to a truth and subsequently testify that such testimony was false. The evidence of such witnesses uncorroborated in essential facts ought to be received with caution, to say the least, and a man ought not to be sent to the penitentiary until a jury has had an opportunity to pass upon it, which has not been done here. No injustice can be done upon a new trial. New trials have frequently been granted upon the showing made in this case. *Bussey v. State,* 69 Ark. 545, 64 S.W. 268; *Mann v. State,* 44 Tex. 642; *Bates v. State* (Miss), 32 South. 915; *Dennis v. State,* 103 Ind. 142, 2 N.E. 349; *State v. Moberly,* 121 Mo. 604, 26 S.W. 364.

*Id.* 98 P. at 742.

An abuse of discretion was found and the trial court denial of a new trial was reversed in following *Powell* to a somewhat similar effect in *State v. Rolax,* 84 Wash.2d 836, 838, 529 P.2d 1078 (1974). Non-dispositive recanted testimony provided a different result in *State v. Hayden,* 28 Wash. App. 935, 627 P.2d 973 (1981) and *State v. Letellier,* 16 Wash.App. 695, 558 P.2d 838 (1977). *York* and other Washington cases were followed and cited in *Robinett v.*

*State,* 494 So.2d 952, 955 (Ala.Cr.App.1986), where the court stated disposition that "[t]he victim may be able to recant his own testimony, but the fact remains that he cannot recant appellant's confession to this crime." Corroboration was found in the defendant's confession. The rule recognized and then found not applicable because of the confession was "when a defendant is convicted solely on the testimony of the now recanting witness, it would be an abuse of discretion not to allow a new trial." *Id.* at 955. *Robinett* and *York* were completely consistent in concept and controlling features.

*Com. v. Mosteller,* 446 Pa. 83, 284 A.2d 786 (1971) initiated the Annotation, *Recantation by Prosecuting Witness in Sex Crime as Ground for New Trial,* 51 A.L.R.3d 907 (1973). The issue presented by *Mosteller* is identical with *York* and now here in *Brown II.* In *Brown II,* there was no corroboration that the sexual offense had ever occurred. In *Mosteller,* Justice Roberts of the Pennsylvania Supreme Court recognized from *Com. v. Krick,* 164 Pa.Super. 516, 520, 67 A.2d 746, 749 (1949):

> "In the absence of sworn evidence impeaching the girl's retraction, a new trial should have been granted."

> \*　　\*　　\*　　\*　　\*　　\*

> In the present case, not only is there nothing to contradict Frieda's recantation, there is evidence from her great aunt that Frieda admitted a month prior to trial that she had fabricated the story. Additionally, Frieda persisted in her retraction despite having been informed that she was thereby subject to criminal charges for perjury and a substantial prison term. This was a clear declaration against interest entitled to considerable credibility, unlike the normal retraction by a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner.

*Mosteller,* 284 A.2d at 789.

It is obvious that the case of *Com. v. McCloughan,* 279 Pa.Super. 599, 421 A.2d 361 (1980) did not supersede the Pennsylvania Supreme Court decision in *Mosteller*

where differentiated facts, including specifically significant corroboration of the offense, were provided in testimony. Likewise, differentiated in *McCloughan*, there was a total lack of credibility and the conclusion of the trial court was found to be justified where the "recanting testimony was replete with inconsistencies and contradictions and was incredible." *McCloughan*, 421 A.2d at 365. *Brown II* is not factually comparable to *McCloughan*.

*Mosteller* was cited with approval in *Com. v. Gaddy*, 492 Pa. 434, 424 A.2d 1268, 1270 (1981), when abuse of discretion was not found and the recantation "was totally lacking in credibility." *Gaddy*, as a consequence, is identically postured with our most recent case of *Lacey v. State*, 803 P.2d 1364 (Wyo.1990), and in factual relevance is directly contrary to our present decision emplaced in requiring or providing for a trial court determination of truth. *See likewise Com. v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984). Overtly and emphatically, the Pennsylvania cases provide no precedential support for this majority decision. This case, as an argued underpinning for this majority's decision, lacks any substantive support in either rule or fact.

*State v. Scanlon*, 108 Ariz. 399, 499 P.2d 155 (1972), as authority on the subject, is consistent within its facts with *York* in recognition that both corroboration and confession existed to justify affirmance of the discretional denial of a new trial. *Scanlon* is not comparable in any factual regard to *Brown II* where here no question of the actual occurrence of the crime exists beyond the recanted testimony. *Cf. State v. Hickle*, 133 Ariz. 234, 650 P.2d 1216 (1982), where a trial court decision granting a new trial on the basis of recanted testimony in the murder case was affirmed on appeal. Credibility was the absolute criteria and validity and determined truthfulness was not in issue under the Arizona recanted testimony standard. *See likewise State v. Scott*, 113 Ariz. 423, 555 P.2d 1117 (1976), where the issue was again credibility and a new trial was not granted.

*Borgess v. State*, 455 So.2d 488, 491 (Fla. App.1984) is inapplicable because there were two victims, only one of whom recanted. The distinction and effect is recognized by Chief Judge Ervin in special concurrence:

> If the conviction of the appellant depended *solely* on the testimony of the minor prosecuting witness, I would be inclined to the view that a denial of a motion for new trial would constitute an abuse of discretion under the circumstances presented. Yet, there was a second victim who neither recanted her testimony, nor maintained close family ties with the defendant. Her testimony paralleled and indeed corroborated much of the other witness's trial testimony. Given this additional evidence I am unprepared to say that the court's denial of the motion was an abuse of discretion.

*Id.* at 492 (emphasis in original).

A more appropriate authority can be found in *Solis*, 262 So.2d 9, where reversal came with recantation of the sole witness by appellate court reversal.

> The trial judge, apparently assuming that his function at such hearing was to determine the truth *vel non* of her recanting testimony, found that she was then and there telling a lie and had theretofore told the truth at trial. Herein lies the error.
>
> * * * It is not within the province of the trial judge at that juncture to determine on which of the two occasions the witness was telling the truth. To do so would be preempting the function of a trial jury. Stated otherwise, the controlling point is that it cannot be said, as a matter of law, that a jury *had* to believe the first testimony and could not, as the trial judge undertook to do, believe the second if it were before them, or consider it at all as it might bear on a possible reasonable doubt concerning the truth of the first.

*Id.* at 10–11 (emphasis in original and footnote omitted). See similarly the Florida concept invoked in the interest of justice requiring a new trial, *Jackson v. State*, 416 So.2d 10 (Fla.App.1982); *Hanson v. State*,

187 So.2d 54 (Fla.App.1966); *Lowe v. State,* 154 Fla. 730, 19 So.2d 106 (1944); and *Fuller v. State,* 92 Fla. 873, 110 So. 528 (1926). *Jackson* and *Hanson* were cited by Judge Ervin in his special concurrence in *Borgess,* 455 So.2d 488.

*State v. Rogers,* 703 S.W.2d 166 (Tenn. Cr.App.1985) again provides no authority since the victim was wired by the police and obtained incriminating statements. Following the sexual charge by his daughter, the father was convicted of both rape and incest. The trial court reversed the rape charge and the appellate court affirmed the incest conviction on the basis that the victim could effectively recant the rape charge but not the incest charge which was supported by the father in the tape recording. *Rogers* is consistent with *York* and *Dunbar v. State,* 522 P.2d 158 (Alaska 1974) follows. With citation of the Annotation, *supra,* 51 A.L.R.3d 907, the Alaska court found the record insufficient to determine whether there was an abuse of discretion and remanded for a factual hearing regarding the "recanting affidavits in contrast to their trial testimony." *Dunbar,* 522 P.2d at 160.

> In considering recantation of trial testimony, particularly in sex crimes, there is no hard and fast rule from which it can be determined whether a new trial is called for. There are a considerable number of cases on this subject, but the most that can be gathered from them is that each case depends upon its own particular facts.

*Id.* at 160. *Dunbar* was clearly a fact and circumstance credibility analysis.

There is only one jurisdiction found, Indiana, which in some cases absolutely rejects the sole evidence recanted testimony rule personified by *York–Powell.* Some Indiana intermediate court cases reject the single witness recanted principle, but even so do not reject the broader issue of credibility. *Best v. State,* 418 N.E.2d 316 (Ind. App.1981) is such a case but see, however, on probable cause for search warrant, *Snyder v. State,* 460 N.E.2d 522 (Ind.App. 1984). These cases, of all of the authorities cited in the majority, are the only cases which provide support for this present decision on this specific question of the sole witness recanted testimony where the initial testimony was uncorroborated by other significant evidence.

However, Indiana law on either the narrow sole evidence issue or the broad judge or jury decision question cannot be simplistically resolved by review of only those two cases. As far back as 1885, the Indiana Supreme Court reversed a death penalty in *Dennis v. State,* 103 Ind. 142, 2 N.E. 349 (1885), where the principal witness recanted. That court, after recognizing the jurisdiction of the jury for fact finding, stated:

> The evidence of the third confession is something more than impeaching evidence, because, if believed by the jury, its tendency will be to defeat a verdict for the state on the indictment in this case. The materiality of the evidence of the third confession cannot be doubted or denied, and it is impossible for the courts to tell how this third confession, in connection with Coffey's previous confessions, might affect the jury; and, in such a case, we understand the rule to be that a new trial should always be granted. Especially should this rule prevail in our state, where, by the fundamental law, it is expressly declared that "in all criminal cases whatever the jury shall have the right to determine the law and the facts." Rev.St. 1881, § 64; Grah. & W. New Trials, 1043, 1044; *Lindley v. State,* 11 Tex.Ct.App. 283; *Greene v. State,* 17 Fla. 669.
>
> By his third confession, Coffey says, in substance and effect, that he had perjured himself in each of his previous confessions, and in his testimony on the trial of this cause. We are met, therefore, with this question: Ought we to permit the appellant, who has been convicted upon confessedly false and perjured testimony, to suffer the extreme penalty of death? With a just sense, we hope, of our official duty, we answer this question in the negative.

*Id.* 2 N.E. at 355.

The same approach was restated in another sole witness case, *Key v. State,* 235

Ind. 172, 132 N.E.2d 143 (1956). The established evidentiary insufficiency and impeaching character of the changed testimony in *Thompson v. State*, 492 N.E.2d 264 (Ind.1986) follows *Dennis* and *Key* in adopting the stated rule. *Chupp v. State*, 509 N.E.2d 835 (Ind.1987) was not an uncorroborated witness case nor was the testimony decisive. In *O'Connor v. State*, 529 N.E.2d 331, 333 (Ind.1988), there was no valid evidence that the principal witness ever recanted and what was said by a third party was fabricated itself. *Strain v. State*, 560 N.E.2d 1272 (Ind.App.1990) provides a conflicting evidence credibility case as did the most recent circuit criminal case in the state, *Thomas v. State*, 562 N.E.2d 43 (Ind.App.1990), where a co-participant guilty plea did not provide credible evidence to exonerate the defendant. At best, the testimony was cumulative and impeaching and not exculpatory with the suspect credibility of the process itself. Again, the Indiana cases provide no persuasive support for this court's present discussion and certainly not for its decision. *Dennis*, 2 N.E. 349.

Identical authority where reversal occurred with principal witness recantation over a considerable scope of jurisdictions and extended time would include: *Ledet v. United States*, 297 F.2d 737 (5th Cir.1962); *Martin v. United States*, 17 F.2d 973 (5th Cir.), *cert. denied* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927); *Myers v. State*, 111 Ark. 399, 163 S.W. 1177 (1914), the nine quarts of whiskey consumed by the jury in a three day session with two abstainers added a basis for a new trial requirement; *Bussey v. State*, 69 Ark. 545, 64 S.W. 268 (1901); *State v. Bassett*, 93 N.H. 62, 35 A.2d 388 (1943); *Martin v. State*, 34 Okl. Cr. 274, 246 P. 647 (1926); *Krick*, 67 A.2d 746; *Morgan v. State*, 136 Tex.Crim. 347, 125 S.W.2d 558 (1939); and *Mann v. State*, 44 Tex. 642 (Tex.1876).

Recanted testimony, and particularly when found in criminal cases, has not been missed in analysis, case collections and journal reviews. The statement provided by 4 Wharton's Criminal Procedure, *supra*, at 188 (footnotes omitted) may not necessarily be accurate in every separate juris-diction, but realistically outlines the subject:

The question whether a new trial will be granted, on the ground that a prosecuting witness claiming to have been the victim of a sex offense on the part of the defendant, has recanted prior testimony, is addressed to the discretion of the trial judge. Ordinarily, a new trial will be granted where the conviction was based primarily on the testimony of such prosecuting witness; a new trial will be refused where the conviction was sufficiently supported by other evidence, where the recantation was obtained by coercion, or where the recantation was subsequently repudiated.

Resource material includes Annotation, *Statements by Witness After Criminal Trial Tending to Show That His Testimony Was Perjured, as Ground for New Trial*, 33 A.L.R. 550 (1924), as supplemented by Annotation, *Recantation of Testimony of Witness as Grounds for New Trial—Federal Criminal Cases*, 94 A.L.R. Fed. 60 (1989); Annotation, *What Standard, Regarding Necessity for Change in Trial Result, Applies in Granting New Trial Pursuant to Rule 33 of Federal Rules of Criminal Procedure for Newly Discovered Evidence of False Testimony of Prosecution Witness*, 59 A.L.R.Fed. 657 (1982); Annotation, *Standard for Granting or Denying New Trial in State Criminal Case on Basis of Recanted Testimony—Modern Cases*, 77 A.L.R.4th 1031 (1990); Annotation, *supra*, 51 A.L.R.3d 907; Annotation, *Statements by a Witness After Criminal Trial Tending to Show That His Testimony was Perjured, as Ground for New Trial*, 158 A.L.R. 1062 (1945); Annotation, *Statement by Witness After Criminal Trial Tending to Show That His Testimony Was Perjured as Ground for New Trial*, 74 A.L.R. 757 (1931); Comment, *supra*, 35 Emory L.J. 969; Comment, *Rethinking the Standard for New Trial Motions Based Upon Recantations as Newly Discovered Evidence*, 134 U.Pa.L.Rev. 1433 (1986); Comment, *Criminal Law and Procedure. Ninth Circuit Adopts Berry Standard for New*

*Trial Based Upon Perjured Testimony,* 11 Golden Gate U.L.Rev. 153, 171 (1981); Note, *I Cannot Tell a Lie: The Standard for New Trial in False Testimony Cases,* 83 Mich.L.Rev. 1925 (1985); and Development, *Criminal Procedure: Minnesota Adopts the Larrison Standard for Granting a New Trial Because of Newly Discovered Evidence. State v. Caldwell,* 67 Minn.L.Rev. 1314 (1983).

There are only a few cases that combine the *Larrison* validity review and the *Berry* probability effect which is the composite standard now adopted by this majority in contradistinction to our historical approach of rejecting *Larrison* and maintaining *Opie* as the standard. *Lacey,* 803 P.2d 1364. The only possible justification for the present majority decision is to move from *Opie* which rendered a new trial grant difficult to essentially now provide an unlimited trial court discretional veto. It should not be for the trial judge nor for this court to determine the ultimate question of the defendant's guilt or innocence. *Minnick,* 263 Cal.Rptr. 316; *Powell,* 98 P. 741. In essence, this court's rules for a new trial are rescinded when applied to newly discovered evidence. The restructured principle is unjustified by logic or precedent if justice is in reality the search for truth. This decision provides the most abusive character of indiscriminate judicial legislating, now done without benefit of briefing, argument or applied precedent. *McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517, *reh'g denied* —— U.S. ——, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991), Marshall, J., dissenting.

### IV(A).

### WYOMING CASES SINCE *OPIE*

The heritage of *Opie* as a *Berry* case is well established. Justice McIntyre in authoring *Opie* cited two cases, *United States v. Johnson,* 142 F.2d 588 (7th Cir.), *cert. dismissed* 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944) and *People v. Beard,* 46 Cal.2d 278, 294 P.2d 29 (1956). In *Beard,* the probable different result test was specifically included. *Johnson* specifically discussed the difference between "might" and

"probable" from *Berry* and *Larrison* and differentiated *Larrison* and then applied *Berry.* See likewise *People v. Sutton,* 73 Cal. 243, 15 P. 86 (1887), which had specifically adopted the *Berry* rule and criteria for occasion with a motion for new trial based on newly discovered evidence.

Wyoming has three recantation decisions which predated *Opie* and two of which the trial court denial of a new trial was reversed and the third affirmed: *State v. Bentine,* 66 Wyo. 222, 208 P.2d 291 (1949), where assault and battery with intent to commit murder in the second degree was affirmed on the basis that the circumstances of the case, including those of the witnesses testifying on the motion for new trial, left a fair discretion for the trial court to find recanting testimony to be exceedingly unreliable and to affirm the initial decision; *Espy v. State,* 54 Wyo. 291, 92 P.2d 549 (1939), second degree murder verdict remanded for state election to accept a manslaughter conviction which would be an offense uncolored by perjured testimony or a new trial would be granted; and *Thompson v. State,* 41 Wyo. 72, 283 P. 151 (1929), homicide with motor vehicle conviction reversed for a new trial.

The cases that have followed *Opie* are variant in character including both civil and criminal with a number involving recantation. Those involving either direct contention of significant perjury or recantation include: *Lacey,* 803 P.2d 1364—sexual assault—post-trial recantation found not to be credible; *King v. State,* 780 P.2d 943 (Wyo.1989)—aggravated assault. Brother confessed, refused to testify and there was no evidence that he would testify if a new trial was granted; *Gist v. State,* 737 P.2d 336 (Wyo.1987)—reversed, retried and reversed again. Brother confessed; however, reversed for conflict of interest of counsel. New trial denial approved on basis that the existence of the brother as potential witness was known before trial including what his testimony should have been; *Jones v. State,* 568 P.2d 837 (Wyo. 1977)—another person admitted to the killing. Court denied recantation status because the affiant who confessed was not a

witness at defendant's trial. Furthermore, affiant refused to testify. This case provided a credibility question of any validity to the recantation; and *Vialpando v. State*, 494 P.2d 939 (Wyo.1972)—post-trial confession of another party. Sentence reversed for retrial. A conflict of counsel problem existed.

In none of these cases was any suggestion provided as ratio decidendi that the trial court should determine empirically that in addition to compliance with the *Opie* test, the trial court should make a determination after recantation that the current statement of the witness "is true."

More conventional cases not involving direct recantation by this court since *Opie* include: *Salaz v. State*, 561 P.2d 238 (Wyo. 1977)—newly discovered witness which was not so new and not per se newly discovered evidence; *Flaim v. State*, 488 P.2d 153 (Wyo.1971)—penitentiary statement from witness was unreliable because of the unsavory background of the witness. The recantation was subsequently recanted at the hearing on defendant's motion for new trial; *Kennedy v. State*, 470 P.2d 372, *reh'g denied* 474 P.2d 127 (Wyo.1970), *cert. denied* 401 U.S. 939, 91 S.Ct. 933, 28 L.Ed.2d 218 (1971)—evidence that the complaining witness may have been drinking lacked materiality for the grant of a new trial; *John B. Roden, Jr., Inc. v. Davis*, 460 P.2d 209 (Wyo.1969)—admission evidence was not sufficient to have affected the result of the trial; and *Ballinger v. State*, 437 P.2d 305 (Wyo.1968)—materiality for *Opie* test not demonstrated.

*Burns v. State*, 574 P.2d 422 (Wyo.1978) was another credibility case in which the defendant, while in the penitentiary, filed an affidavit recanting his testimony at trial. At a hearing on the motion, the affiant refused to answer questions on the ground of self-incrimination. Consequently, he recanted the recantation. Likewise, in *Siegert v. State*, 634 P.2d 323 (Wyo.1981), there were third-party affidavits that another person was the miscreant in the drug case. The affiants were missing witnesses at trial. No continuance was requested and the testimony was not preserved. The *Salaz* missing witness test was applied for trial by this court.

Likewise, we would find: *Bueno–Hernandez v. State*, 724 P.2d 1132 (Wyo.1986), *cert. denied* 480 U.S. 907, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987)—materiality issue. Claimed newly discovered evidence was cumulative and not dispositive contrary to the *Opie* requirements; *Frias v. State*, 722 P.2d 135 (Wyo.1986)—demonstrated lack of due diligence which resulted in a reversal of conviction on the basis of ineffectiveness of counsel. Involved was evidence of the propensity of the victim to have threatened suicide; *Lansing v. State*, 669 P.2d 923 (Wyo.1983)—non-testifying witness showed up post-trial. The case was decided on a due diligence denial basis and a newly discovered witness concept; and *Grable v. State*, 664 P.2d 531 (Wyo.1983)—collateral evidence about the non-existent illness of a witness who had not appeared was rejected as sufficiently *Opie* defined as to likely produce a different verdict and was only impeaching evidence. In most recent examination, before *Lacey*, we considered in *Best v. State*, 769 P.2d 385 (Wyo.1989) the *Opie* test for the attempted murder offense. Specifically in *Best*, this court rejected the more relaxed standard of *Larrison*, even when perjury is in question. *Best* did not specifically involve recantation.

Four additional cases require reference where I either did or would have dissented, and in no regard in any of the cases was a contention made that the present hybrid adaptation of *Larrison–Berry* be substituted or that the court should abandon *Opie* for the differentiated standard of *Larrison*. These include: *Story*, 788 P.2d 617, Urbigkit, J., dissenting—contended post-trial discovered perjury of one of the complaining witnesses was considered. No hearing on the motion for new trial on the basis of perjury was provided or required by appellate decision. Essentially, the majority decision said that adequate evidence on the subject was provided without a hearing. The case is unfortunate because the realistic posture achieved is that probable perjury of one of the complainants "was not of such significance that would likely

have made a difference in appellant's five convictions of sexually assaulting his patients", *id.* at 623; *Cutbirth v. State,* 751 P.2d 1257 (Wyo.1988), Urbigkit, J., dissenting—newly discovered evidence derived from a ballistic expert directing attention that the death was accidental and not a homicide. *Opie* denial was premised on a due diligence question which was then foreclosed by denial of an ineffectiveness of counsel review; and *Keser v. State,* 737 P.2d 756 (Wyo.1987), Urbigkit, J., dissenting—third party affidavits addressing probable complaining witness perjury. Denial of a hearing was premised on effect to "merely impeaches a witness." *Id.* at 760. Another reason given in decision for denial was lack of diligence in finding the classmates in advance of trial to whom the incriminatory admissions of perjury might have been communicated. The fourth decision relative to newly discovered evidence as a basis for a new trial is *Hopkinson v. State,* 679 P.2d 1008 (Wyo.), *cert. denied* 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984), which continues in litigation years later. That case, by reference to *Grable,* 664 P.2d 531, explicitly approved the *Berry* rule. *Hopkinson,* 679 P.2d at 1113. In disposition of not one of the foregoing cases, was thought given that this court should adopt a portion of the *Larrison* test or add to *Opie* a further criteria that the trial court was required to find the recantation of a witness as true in advance of considering whether to grant the new trial relief.

### IV(B).

### NATIONAL PRECEDENT

Any deep dive into the murky waters of arguable perjury, *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), and motions for new trial provide a clear justification for one determinative conclusion. Supervening from all of the thoughtful cases is the concept that the exercise of discretion should not be arbitrary within the course of events so that the judgment of conviction would be rendered unjust. *State v. Knapper,* 555 So.2d 1335 (La.1990). *Cf.* Comment, *Relief From Convictions Based Upon Perjured Testimony—A Proposal for a Reasonable Standard,* 11 Santa Clara Law. 316 (1971). Louisiana follows the credibility inquiry and the probability effect criteria of the *Berry* rule.

It is not the trial judge's duty to weigh the new evidence as though he were the jury, rather it is his duty to determine whether this new material is fit for a new jury's judgment.

*James,* 490 So.2d at 620.

Mississippi, in most current review, follows a probability test with facts and circumstances considered for determination of credibility. "Where the witness' recantation undermines the [court's] confidence in the correctness of the outcome at trial, a new trial should be ordered." *Yarborough v. State,* 514 So.2d 1215, 1220 (Miss.1987). *See also Moore v. State,* 508 So.2d 666 (Miss.1987). *Gathings v. State,* 46 So.2d 800 (Miss.1950) provided the facts and circumstance interest of justice foundation for Mississippi law. Credibility and not absolute believability seems to be the test in Alabama, although the characterization classification is not without some doubt. *Bell v. State,* 565 So.2d 1244 (Ala.Cr.App. 1990); *Womack v. State,* 541 So.2d 40 (Ala. Cr.App.1987), *judgment rev'd* 541 So.2d 47 (Ala.1988). " '[R]easonableness of the allegations made in the petition and the probability or improbability of their truth.' " *Colvin v. State,* 521 So.2d 1352, 1353 (Ala. Cr.App.1987) (quoting *Holsclaw v. State,* 429 So.2d 1185, 1187 (Ala.Cr.App.1983)). "[T]he trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; * * *." *Ex parte Frazier,* 562 So.2d 560, 569–70 (Ala.1989). That the court is reasonably well satisfied and that the jury might have reached a different conclusion is clearly the law of North Carolina. *State v. Brown,* 327 N.C. 1, 394 S.E.2d 434 (1990); *State v. Britt,* 320 N.C. 705, 360 S.E.2d 660 (1987). See also, for reversal after the principal witness recanted, *State v. Ellers,* 234 N.C. 42, 65 S.E.2d

503 (1951). Credibility appears to be the test for Georgia in *Young v. State*, 194 Ga.App. 335, 390 S.E.2d 305 (1990) and *Drake v. State*, 248 Ga. 891, 287 S.E.2d 180, *cert. denied* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1322 (1982).

The New Mexico approach was the *Berry* standard of credibility and "likely to change the result of a new trial." *State v. Doran*, 105 N.M. 300, 731 P.2d 1344, 1350 (1986), *cert. denied* 105 N.M. 290, 731 P.2d 1334 (1987). *See also Volpato*, 696 P.2d 471. The credibility likely to produce a different result is an adaptation of the *Berry* approach followed in Kansas. *State v. Bryant*, 227 Kan. 385, 607 P.2d 66 (1980); *State v. Johnson*, 222 Kan. 465, 565 P.2d 993 (1977). Credibility is also recognized as the test in Alaska, *Ahvakana v. State*, 768 P.2d 631 (Alaska App.1989)—trial court has duty to assess the credibility of the new evidence and its probable impact. The California standard is credibility, reasonably probable effect in recognition that the trial court is not the final arbiter of the truth or falsity of the new evidence. *Minnick*, 263 Cal.Rptr. 316; *People v. Cole*, 94 Cal.App.3d 854, 155 Cal.Rptr. 892 (1979). Rhode Island likewise applies the credibility test in *State v. Estrada*, 537 A.2d 983 (R.I.1988).

The Pennsylvania law, as following from *Mosteller*, 284 A.2d 786 in reversal for retrial on the basis of recanted testimony through *Com. v. Bernstein*, 357 Pa.Super. 13, 515 A.2d 54 (1986) and *Com. v. Nelson*, 484 Pa. 11, 398 A.2d 636 (1979), appears to follow the *Larrison* test of reasonable satisfaction of truth. Credibility is, however, in the cases used almost synonymous with satisfaction of truth. As, for example, in *Bernstein* where that was the issue considered by the trial court—credible recantation. The test also applied in *State v. Murray*, 559 A.2d 361 (Me.1989) was probability of effect and credibility. *State v. Preston*, 521 A.2d 305 (Me.1987). Minnesota is clearly a *Larrison* standard state. *State v. Erdman*, 422 N.W.2d 511 (Minn. 1988); *State v. Caldwell*, 322 N.W.2d 574 (Minn.1982); Development, *supra*, 67 Minn. L.Rev. 1314. Conversely, the credibility and probability test is followed in North Dakota in *State v. Garcia*, 462 N.W.2d 123 (N.D.1990).

In *People v. Van Den Dreissche*, 233 Mich. 38, 206 N.W. 339 (1925), a case that predated most contemporary reviews and decisions, the test for analysis within the discretion of the trial court was determination of improbability or if completely discredited by its own contradictions. This was an improbability recognition which, in fact, was the early cursor of the credibility concept now generally considered as a tenet in the *Berry* line of cases. A consistent theory as a search for justice is continued by the reversal found in *People v. Smallwood*, 306 Mich. 49, 10 N.W.2d 303 (1943).

The federal cases divide generally between the *Berry* standard and the *Larrison* standard considered in Annotation, *supra*, 59 A.L.R.Fed. 657, to be differentiated by a probable change and might or possible standard. *See likewise*, Comment, *supra*, 35 Emory L.J. at 974–75 and Comment, *supra*, 11 Golden Gate U.L.Rev. at 171 (referencing *United States v. Krasny*, 607 F.2d 840 (9th Cir.1979), *cert. denied* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980)). It is apparent that neither a consistency in statement of the standard nor any significantly differentiated result in application of either rule can be consistently extracted from consideration of at least a significant number of the federal court cases. As is recognized, the "suggestion" that the *Larrison* test might be more lenient is, in fact, more illusory than real.

> *Larrison* does provide a less demanding standard than does *Berry*—"might" versus "probable"—regarding the degree of certainty that a judge must have in the likelihood of a different result on retrial. But this "easing" of the standard is counterbalanced by *Larrison's* further requirement that the judge first be convinced of the truthfulness of the recantation.

Comment, *supra*, 35 Emory L.J. at 978.

*Berry*, conversely, appears to require more certainty that a different result would ensue, but does not require that the

judge be as sure of the truthfulness of the recantation.

The tests seem equally exacting; the difference is that *Berry* is more demanding regarding the probative value of the recantation while *Larrison* emphasizes the credibility of the witness. Hence, the two tests in actuality may present nearly equivalent hurdles to a defendant requesting a new trial.

*Id.*

Neither of these sources or the significant number of other authorities consider a standard even more exacting than the most demanding character of each of the two rules which is extrapolated to create a result which is the present effort of the majority in this decision. The thought of most current writers is that the system is built too far toward enamoring perjury and deterring efforts of the innocent to achieve corrective justice. Donnelly, *Unconvicting the Innocent,* 6 Vand.L.Rev. 20 (1952). No one seems to conceive or advocate that an even stricter standard has justification so that it should now be judicially adopted for Wyoming.

The integrity of the judicial process requires that defendants be accorded a fair trial free from the taint of perjured testimony. But the viability of the system also requires that criminal justice be administered efficiently and that the public have faith in the finality of judgments. Present standards for the granting of a new trial in false testimony cases have sacrificed judicial integrity in their failure to reconcile these competing interests. The intermediate test presented in this Note offers a viable resolution to this conflict.

Note, *supra,* 83 Mich.L.Rev. at 1949.

As *Dotson* and the other recantation cases illustrate, recanting testimony is generally given so little weight that some of the most fundamental principles underlying our system of criminal justice are often disregarded. The virtual presumption of the invalidity of recantations sometimes results in the continuing incarceration of innocent citizens and attendant consequences even when the witness upon whose testimony the conviction rests comes forward and attempts to do justice by telling the truth. Such a result is hardly consistent with a system that avowedly "would rather let 100, maybe 1,000, go free rather than send a single innocent person to prison.

It is clear that it is the *presumption* of the incredibility of recantations that is the culprit here. Yet equally clear is the fact that an automatic granting of new trial motions based on recanting testimony would be unwarranted and inappropriate. What is needed in the judicial approach to recantations is substantial inquiry into the circumstances and possible motives in each case without preconceived notions as to whether the recantation is true or false. The current approach requires that the court deny a new trial motion based on recanting testimony *unless* the defendant meets his or her burden of proving that the initial testimony was false. This approach has the effect of allowing a conviction to stand even where the judge reviewing the recantation finds that it is equally as credible as the original testimony, without allowing a jury the opportunity to pass on that credibility. More consistent with the principles of our criminal justice system would be an approach *permitting* the granting of new trials *unless* the judge is satisfied that the recantation is false. In other words, the elimination of the presumptions regarding recanting testimony and a slight adjustment in the burden of proof in motions for new trials would result in better safeguards for innocent citizens who are wrongfully accused and hence would add to the integrity of the criminal justice system. A "fastidious regard for the honor of the administration of justice" demands that such a refinement be made.

Comment, *supra,* 35 Emory L.J. at 1008–09 (quoting *Mesarosh,* 352 U.S. at 14, 77 S.Ct. at 8) (footnotes omitted and emphasis in original). *See likewise* Comment, *supra,* 11 Santa Clara Law. 316. *See also* Murray, *Convictions Obtained by Perjured Testimony: A Comparative View,* 27 Ohio St.L.J. 102 (1966); Whitman, *A Proposed*

*Solution to the Problem of Perjury in Our Courts,* 59 Dick.L.Rev. 127 (1955); Black, *Why Judge Samuels Sent Gary Dotson Back to Prison,* 71 A.B.A.J. 56 (Sept. 1985); and Comment, *supra,* 134 U.Pa.L.Rev. 1433.

In an article which initiated recognition of the problems involved in *People v. Dotson,* 99 Ill.App.3d 117, 54 Ill.Dec. 416, 424 N.E.2d 1319 (1981), the author concludes:

> Our courts need to rethink carefully the current treatment of recantations, especially in those cases in which a victim or sole prosecuting witness recant apparently without threat, bribe, or other improper influence. The courts must structure the credibility inquiry in recantation cases to provide a realistic judicial solution for instances in which an arguably innocent person has been incarcerated for a crime which may not have even occurred. Until judicial provision is made for such instances, denials of motions for new trials in these "unusual" cases will continue to arouse public outcry and erode confidence in our judicial system.

Comment, *supra,* 134 U.Pa.L.Rev. at 1459 (footnote omitted).

Within the volume of cases, the asserted criteria of decision is frequently delineated by contentions of abused discretion. Obviously what we address here is not discretion, it is the question of the test to be applied. Discretion as the process of distinguishing between available choices is not the subject addressed. *Martin v. State,* 720 P.2d 894 (Wyo.1986). The parameter of responsibility of the trial judge in determining whether reasonable credibility exists for recanted evidence is the decision of the court when it grants a directed verdict or a judgment notwithstanding the verdict.

**6.** It is apparent that another distinction can be drawn among cases following the *Larrison* concept. Some address as does the majority here whether the new evidence is true, although the prior and general rule was reasonable satisfaction that the prior testimony was false. *Larrison,* 24 F.2d 82; *Erdman,* 422 N.W.2d 511; *Caldwell,* 322 N.W.2d 574. The mental gymnastics involved are singularly different whether evaluating asserted prior falsity or now determining what is presently true.

*Erickson v. Magill,* 713 P.2d 1182 (Wyo. 1986); *Cimoli v. Greyhound Corporation,* 372 P.2d 170 (Wyo.1962); *Chandler v. Dugan,* 70 Wyo. 439, 251 P.2d 580 (1952).

Even in examining credibility as a concept for the recanted testimony/new trial motion review, it is also apparent that differentiated concepts are advanced without necessarily having the benefit of judicial recognition of an orderly procedural method for decision. One course of examination to determine credibility is to review the transactional events as they would define probability of validity, what is the explanation for the original perjured testimony, why the change, what external factors are existent, is there anything in the nature of the conduct that relates to probable validity and what corroboration or other justification and supporting evidence can be applied to the impossible effort to assess absolute validity of anything. *Smallwood,* 10 N.W.2d 303; *Martin,* 246 P. 647. The second concept is simply to address the recanted testimony in relation to the original testimony as an assessment of its validity.[6] *United States v. Troche,* 213 F.2d 401 (2nd Cir.1954); Recent Case, *Criminal Law— Judicial Discretion in Considering Recantation as a Ground for a New Trial,* 39 Minn.L.Rev. 316 (1955).

The rule which these cases [*Smallwood* and *Martin*] suggest represents an abrupt departure from the requirements of both the *Berry* and the *Larrison* tests. It seems reasonable to assume that this newly proposed rule implicitly contains some of the *Berry–Larrison* requirements, such as the necessity that the recantation be material and that it became available to the defense only after the conclusion of the trial. But it contemplates a significant shift in

The *Larrison* test for granting a retrial differs from the *Berry* test in two other respects. First, the *Larrison* standard looks back to the trial to determine what effect the perjured testimony had on the prior decisionmaker, while the *Berry* standard anticipates the retrial by determining what effect the new evidence would have on the new decisionmaker. Development, *supra,* 67 Minn.L.Rev. at 1319.

the duty of the trial judge who is reviewing the new trial motion: it does *not* require the judge to make an absolute determination regarding the truth or falsity of the recanting testimony. Rather, whenever he or she is in doubt, the motion should be granted. The effect of the adoption of such a rule can be seen most clearly in a case like *Troche*, where the trial judge was clearly undecided as to when the witness was lying. Yet, he felt compelled to deny the defendant's motion for a new trial, since he was not fully convinced that the witness's trial testimony was false. Under the approach suggested by *Smallwood* and *Martin*, the judge would have been fully justified in granting the defendant's motion, as he clearly wanted to do.

Comment, *supra*, 35 Emory L.J. at 999 (footnotes omitted and emphasis in original).

If one general trend can be found through the multitude of cases where credibility is considered, there is utilized dual concepts of both a process, *United States v. Leibowitz*, 919 F.2d 482 (7th Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480, *reh'g denied* —— U.S. ——, 111 S.Ct. 2049, 114 L.Ed.2d 133 (1991),[7] and actual events analysis. *United States v. Mazzanti*, 925 F.2d 1026 (7th Cir. 1991). If the events are definitive, credibility is lacking. *Ahvakana*, 768 P.2d 631; *Van Den Dreissche*, 206 N.W. 339. If the changed testimony in itself denies belief, credibility is also lacking. *Bell v. State*, 90 So.2d 704 (Fla.1956); *Bryant*, 607 P.2d 66; *Estrada*, 537 A.2d 983. A broad use of the facts and circumstances test relates to how the change occurred as equally considered with what was the change. *Cole*, 155 Cal. Rptr. 892; *Nelson*, 398 A.2d 636. This embodies the thesis of analysis of "I care not what you say, but I wish to know why" in order to determine the speaker's purpose to understand the content. Clearly, *Lacey*, 803 P.2d 1364 follows this approach. *Vol-*

*pato*, 696 P.2d 471. *Cf. Mosteller*, 284 A.2d 786.

There is another undefined aspect which justifies recognition in the results in the recanted evidence cases. Do you first apply the *Larrison* three part test or the *Berry* five or six part test and then assess credibility or absolute validity? Or should the examination first address general credibility or intrinsic validity before the other criteria have been separately examined? It may well be in analysis of the cases that credibility or accepted validity is a considerably more difficult burden upon the trial court than is the procedural criteria leaving the appellate court to seek the easiest decision first. *Dunbar*, 522 P.2d 158.

Be that is it may, it appears to me that the proper approach in these kinds of cases and particularly when related to recanted testimony should address the foundational basis to first assess credibility or, if the other test, to be determinably valid and then only if necessary to move in review to further criteria whether it is newly discovered material and not just impeaching, etc. If the trial court makes an initial determination of credibility and then finds the other criteria of *Opie*, *Berry*, or *Larrison* does exist, justice requires jury reexamination. *Dennis*, 2 N.E. 349; *Smallwood*, 10 N.W.2d 303; *Volpato*, 696 P.2d 471.

These concepts and concerns are presented for particular examination in the cases involving the sole witness recanted testimony case which come specifically into this case. I find the discussion on this issue in the majority opinion to be both unpersuasive and unjustified by existing case law. If we have credibility and materiality and then a sole witness basis of guilt determination, we are obviously looking at a horrifying question of whether an innocent man may be improperly punished by the criminal justice system. *Mesarosh*, 352 U.S. 1, 77 S.Ct. 1. This process is found in most cases—first to address credibility and then

---

7. That court only recognized in regard to surprise what equally could be applied to assessed validity.

The tendency of judicial language to become ossified in rules is a familiar one, and it is illustrated by the promotion of surprise from a factor bearing on the acceptance of a recantation to an absolute requirement of such acceptance.

*Leibowitz*, 919 F.2d at 484.

next whether the case factually presents a sole witness basis of guilt determination or provides a body of corroboration and supporting evidence sufficient separately to sustain conviction. *Dunbar*, 522 P.2d 158; *Smallwood*, 10 N.W.2d 303.

The superseding facet of this case is first that the prosecution related to a time identified event totally dependent upon the testimony of the recanting witness and secondly that the "corroborating evidence" disproved that the event could have occurred on the stated date. Brown was convicted by a one witness case supported only by an overview of bad acts in a prior occurrence with the expert witness vouching for the credibility of the prosecutrix while other evidence disproved occurrence. *Solis*, 262 So.2d 9; *Mullins*, 375 S.W.2d 832; *York*, 704 P.2d 1252.

On this confined subject of a sole witness recantation within the broader subject of motions for new trials based on newly discovered evidence, the majority is wrong on applied Wyoming and national precedent and in constitutional and philosophical concepts requiring jury fact finding. Unfortunately, we write here not just for this result-oriented decision to send Brown to prison, but as a creation for injustice in future cases.

### IV(C).

### MINORITY VIEW—VERMONT AND FLORIDA

In analysis, rule statement and decisional conclusions, there is little that is uniform and nothing that is unanimous in scope within the many cases involving motions for new trial based on newly discovered evidence, recanted testimony and perjury. There are two jurisdictions which have, without apparently recognizing the deviation from other cases, adopted a standard which would have some equivalency with what this majority now imposes upon Wyoming. *See Bell*, 90 So.2d 704; *State v. Briggs*, 152 Vt. 531, 568 A.2d 779 (1989); and *State v. Robillard*, 146 Vt. 623, 508 A.2d 709 (1986). The Vermont and Florida rules are stated to be reasonably well satisfied that the testimony given by a material witness was false and the jury would probably render a different verdict. In the concept, it is the duty of the court to deny a new trial where the court is not satisfied that changed testimony after recantation is true. *See however McCallum v. State*, 559 So.2d 233 (Fla.App.1990), where the affidavit provided a strong inference of appellant's innocence. There should be resort to a jury to hear the witnesses in question in the interest of justice; *Mitchell v. State*, 493 So.2d 1058 (Fla.App.1986), return to the testifying truthfully and probable change result concept originally enunciated in *Bell;* and *Feagans v. State*, 487 So.2d 408 (Fla.App.1986), the determination that the recantation testimony was not credible. Specifically contra, see *Solis*, 262 So.2d 9.

### V.

### TRIAL JUDGE BIAS, PREJUDICE AND PREDETERMINATION

#### A. How We Get to the Subject.

Consideration of a rehearing by the appellate court is no doubt emotionally and philosophically similar to the trial court's consideration of a new trial and particularly so when convinced of guilt even when a principal witness recantation occurs.

Regardless, the justice delivery system requires discretion and decision of the judiciary to be exercised with thought and even-handed fairness and not by applied predetermination. This is one of the reasons why, in some jurisdictions, a remand for retrial may justify required reassignment.[8] This is also the reason that I do not

---

8. See, for example, U.S.C.S. Court Rules, Court of Appeals Seventh Circuit, Rule 18 (1983):

Whenever a case tried in a district court is remanded by this court for a new trial, it shall be reassigned by the district court for trial before a judge other than the judge who heard the prior trial unless the remand order directs or all parties request that the same judge retry the case. In appeals which are not subject to this rule by its terms, this court may nevertheless direct in its opinion or order that this rule shall apply on remand.

*See also Town Pump, Inc. v. District Court of Eighteenth Judicial Dist. In and For Gallatin*

accept the thesis of the *Hopkinson* cases, contrary to the law of any other jurisdiction, that post-conviction relief is only a continuation of the original proceeding in order that the peremptory judge challenge rule, W.R.C.P. 40.1(b)(1), will not be available to the accused.[9]

This case presents two facets of judicial conduct and predetermination that are of deep concern. *Initially, before those subjects are addressed, it is necessary to recognize that questions of a fair and impartial judge or obligation of recusal was not stated as an issue on appeal or briefed by the litigants. We are faced with the discussion of the issue in the majority which lays out some broad principles as dicta or gratuitous discussion with which I am in total disagreement.*

### B. Factual Basis of Presented Issue.

This case, however structured in decision, now presents an issue addressing the status of the deciding trial judge and what the record shows before he held the hearing about his bias, prejudice or prejudgment. At the hearing on the motion for new trial held June 20, 1989, an affidavit of a juror who served on the original jury was "not marked but placed into the record," and, at the same time, the entire juvenile files involving both K.B. and M.C.X. were also placed in the record by court order. Nothing in the record reveals that counsel for Brown in that hearing ever had access to those confidential files in advance and appellate counsel stated in response to inquiry at oral argument before this court that he had not reviewed the contents by that time.

Since the subject of recusal of the trial judge was not raised as any designated issue on appeal, authorship for the present review essentially comes from the twenty-page monologue discussion at the new trial hearing which constituted a lecture by the trial court to Brown during which the incompetence of the Wyoming Supreme Court and the extraordinary expertise of the trial judge constituted principal topics. The fact that the trial court continued to disbelieve both Brown and the recanted testimony was also clearly communicated.

Considering that the majority addresses the subject of a biased or prejudging judge within the information provided by this record, which dicta, as it is, might serve unpleasantly for future cases, requires response. This is a very, very difficult and extremely significant subject and one about which this court in past cases has given less than realistic appellate attention. An

County, 180 Mont. 358, 590 P.2d 1126 (1979); Annotation, *Disqualification of Original Trial Judge to Sit on Retrial After Reversal or Mistrial; Federal Cases*, 22 A.L.R.Fed. 709 (1975); and Annotation, *Disqualification of Original Trial Judge to Sit on Retrial After Reversal or Mistrial*, 60 A.L.R.3d 176 (1974). The majority approach and practice is apparently to the contrary. 46 Am.Jur.2d, *Judges*, § 184 at 212 (1969). See, however, *People v. Jackson*, 391 Mich. 323, 217 N.W.2d 22 (1974).

9. *State ex rel. Hopkinson v. District Court, Teton County*, 696 P.2d 54, 62 (Wyo.), *cert. denied* 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985) held that a proceeding under the Wyoming post-conviction relief statute was "a continuing part of the criminal proceeding." No case law was cited to support the "bald" conclusion. Directly contrary authority which holds that the post-conviction relief proceeding is a separate civil process includes: *Heflin v. United States*, 358 U.S. 415, 418 n. 7, 79 S.Ct. 451, 453 n. 7, 3 L.Ed.2d 407 (1959); *United States v. Huss*, 520 F.2d 598 (2nd Cir.1975); *State v. Price*, 715 P.2d 1183 (Alaska App.1986); *State v. White*, 470 So.2d 1377 (Fla.1985); *Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986); *People v. Griffin*, 124 Ill.App.3d 169, 79 Ill.Dec. 509, 463 N.E.2d 1063 (1984), *judgment rev'd* 109 Ill.2d 293, 93 Ill.Dec. 774, 487 N.E.2d 599 (1985); *Shields v. State*, 169 Ind.App. 238, 348 N.E.2d 36 (1976); *Kelly v. Nix*, 329 N.W.2d 287 (Iowa 1983); *Rinehart v. State*, 234 N.W.2d 649 (Iowa 1975); *Stahl v. Board of County Com'rs of Geary County*, 198 Kan. 623, 426 P.2d 134 (1967); *Harris v. Com.*, 296 S.W.2d 700 (Ky.1956); *Roberts v. Director of Patuxent Institution*, 226 Md. 643, 172 A.2d 880 (1961); *State v. Edmonson*, 438 S.W.2d 237 (Mo. 1969); *Coleman v. State*, 633 P.2d 624 (Mont. 1981), *cert. denied* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982); *Varnson v. Satran*, 368 N.W.2d 533 (N.D.1985); *Smith v. State*, 79 N.M. 450, 444 P.2d 961 (1968); *State v. Loray*, 46 N.J. 417, 217 A.2d 450 (1966); and *Ouimette v. Moran*, 541 A.2d 855 (R.I.1988).

Unfortunately, this egregious mistake was restated again without further citation of authority by this court in *Pote v. State*, 733 P.2d 1018, 1020, 1024 (Wyo.1987) (Urbigkit, J., dissenting). This court swims upstream by this result-driven adaptation within the body of law to be totally alone on this issue.

accurate or an appropriate re-analysis of the subject requires return to the historical premise and the constitutional imperative *within the facts presented here*. The test, no differently stated than for a fair and impartial juror, is that within ethical and legal limitations, a trial court should not serve if he undertakes a decision with pre-disposition or having made an unequivocal advance decision. Wyoming Code of Judicial Conduct, Canon 3(E)(1) (1990).[10] The litigant is entitled to a fair and impartial decisionmaker. Due process of law under state and federal constitutional imperatives requires no less. Wyo. Const. art. 1, § 6, due process; Wyo. Const. art. 1, § 8, open courts.

**10.** A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

*Commentary:*

*Under this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules in Section 3E(1) apply. For example, if a judge were in the process of negotiating for employment with a law firm, the judge would be disqualified from any matters in which that law firm appeared, unless the disqualification was waived by the parties after disclosure by the judge.*

*A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification.*

*By decisional law, the rule of necessity may override the rule of disqualification. For example, a judge might be required to participate in judicial review of a judicial salary statute, or might be the only judge available in a matter requiring immediate judicial action, such as a hearing on probable cause or a temporary restraining order. In the latter case, the judge must disclose on the record the basis for possible disqualification and use reasonable efforts to transfer the matter to another judge as soon as practicable.*

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge had been a material witness concerning it;

The first event factually presented was an affidavit obtained and submitted on the date of commencement of the scheduled hearing for the motion for new trial.

The juror affidavit in part stated:

1. That I was a juror on the case against Walter Joe Brown.

2. That I approached Mr. Brown's attorney, George Andrews, after the verdict.

3. That Mr. Andrews told me to talk to John D. Troughton, District Court Judge, which I did, and was informed the verdict would stand becau[s]e the man was guilty and you can't second guess yourself.

*Commentary:*

*A lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of Section 3E(1)(b); a judge formerly employed by a government agency, however, should disqualify himself or herself in a proceeding if the judge's impartiality might reasonably be questioned because of such association.*

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;

(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

*Commentary:*

*The fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself disqualify the judge. Under appropriate circumstances, the fact that "the judge's impartiality might reasonably be questioned" under Section 3E(1), or that the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" under Section 3E(1)(d)(iii) may require the judge's disqualification.*

Wyoming Code of Judicial Conduct, Canon 3(E)(1) (1990) (footnotes omitted).

4. That on June 20, 1989, Tom E. Barnes, Mr. Brown's current attorney talked to me and indicated I was free to refuse to talk about the case, and I would not be subpoenaed or forced into Court in any fashion or manner.

5. I agreed to discuss the case. I was told Kathy Brown has now recanted her testimony regarding the August 12th incident for which Mr. Brown was convicted, but was consistent with prior sexual abuse.

6. At trial I could not come to terms fully as to what constitutes reasonable doubt; however, after further discussion with jury members, I willfully voted to convict, but was not entirely comfortable with the result.

7. As the result of the further information I was given, which was simply that Kathy Brown had recanted her testimony, I feel the verdict would most likely be different if this information was presented at trial; however, I cannot say what others may have convinced me of.

The trial court then discussed this subject as provided as part of the twenty-page decisional statement by included specific reference:

When a juror such as Juror McCarty calls up suffering the agony that judges and jurors often face, the agony that arises from the things about which I have just spoken to you, the agony that arises because you begin to second guess yourselves, when a juror such as Mrs. McCarty calls suffering such agony, if you have any sensitivity, and I hope I have some, what you do is you try to comfort such a person. If you care anything about them as human beings you don't want to see human beings suffer. Particularly if you're a judge you don't want to see a person such as Mrs. McCarty getting the kinds of ulcers that Judge Ranck got. And so what you do you do: You try to reassure her. I tried to reassure Mrs. McCarty. I told her several things. I told her, Mrs. McCarty, you can't second guess yourself. The first thing that you learn in being a judge is that you just can't second guess yourself. What you have to do is you

just have to committ [sic] yourself to doing the best possible job that you can do. You have to listen carefully to what the witnesses have to say. You have to listen carefully to what the lawyers have to say. You have to listen carefully to what your own fellow jurors have to say. You have to carefully study the evidence, and then when the times comes, you have to do what you think is right. And after you have consulted with your fellow jurors and done all of those things and have made you decision when you think is the right one, then you don't back off of it. You tell Mrs. McCarty that it's not like you were alone in making the decision. You had eleven other people to talk to, to listen to. It's not like being a judge who is all by himself with no one to talk to, no one to help him, no one to point out his mistakes or his errors, no one to balance off his point of view. You tell Mrs. McCarty, because you have that kind of help and assistance, then the chances of you making the right decision are eleven times better. You tell Mrs. McCarty, have faith in your fellow man. Have faith in your fellow jurors. And remember that they convinced you and they were convinced of the guilt of Mr. Brown. And so don't second guess eleven other people or yourself. Remember that the reason that there are twelve people is to guard against mistakes being made. It's called collective wisdom. And finally, you tell Mrs. McCarty that it really doesn't matter because it's not your decision to make, but if it's any comfort to you, Mrs. McCarty, then [this judge] wants you to know that he agreed with the verdict of the jury; that he agreed that Mr. Brown was guilty beyond a reasonable doubt. And then what happens, it comes back that [I] tell[ ] Mrs. McCarty Mr. Brown is guilty anyway. That's how things get twisted. It's kind of like the game we played in school of 'did you hear', and pass it along. Each time it's passed from one mouth to the other something gets lost in the translation.

The further difficulty presented is what is revealed in the juvenile records of both M.C.X. and K.B. which, as far as the record reveals, was not available to counsel for Brown prior, or for that matter, after the hearing. Those records appear to have remained sealed until shortly before the time oral argument was held when the entire record, including the confidential files, were reviewed by this writer.

At a juvenile hearing over a year earlier, M.C.X. was sent to the Girls' School in Sheridan, Wyoming. The juvenile specifically and directly restated what the trial court already apparently knew—that she recanted her testimony which had created the crime and established the guilt of her father in the original trial. Although not directly stated, it is clear that the trial court specifically rejected the validity of any recantation in the disposition that he then made by commitment of the juvenile to the jurisdiction of the State Board of Charities and Reforms for confinement at the Girls' School in Sheridan instead of her choice to return to her family. The trial court apparently resolved placement by determination that the mother had to abandon her husband (the father), who she continually claimed to be innocent, or the daughter would not be permitted to resume the family relationship with her mother.

It is within this perspective that I disagree with the majority's conclusion and in particular a judicial "duty to serve." We are presented with a trial judge who, in advance of a new trial proceeding based on a principal witness recantation, expressed an unqualified opinion about the guilt of the accused and then in the presence of the principal accusatory witness, rejected her recantation at a hearing when Brown was neither present nor subsequently advised of what had been said. The impartial jury required by Wyo. Const. art. 1, § 10 equally applies to a judge who has overtly predetermined the case before the initiation of the hearing when a discretional decision is made to grant or deny the new trial. The significance of the twenty-page monologue is in the showing not so much of trial court impatience with this Supreme Court and by name, this writer's dissent in *Brown I*, but a continued closed mind carried forward from the first trial which realistically afforded no substantive consideration of the credibility of the recantation no matter what the evidence might have been.

Wyoming has an adequate number of judges so that the judicial system need not subject it to an appearance of predetermined decision instead of fairness and willingness to listen before deciding. I remain no happier about *Story*, 788 P.2d 617, Urbigkit, J., dissenting, as evidenced in dissent in a similar situation because of the untidiness portrayed about the Wyoming judicial system. Tested against this factual record, the one Wyoming case cited does not procedurally or constitutionally justify or support the conclusion taken. *Cline v. Sawyer*, 600 P.2d 725 (Wyo.1979) involved an associated relationship and, in the challenge for cause, related in no way to the issue presented here. This present appeal certainly does not provide a duty to sit edifice justifying the new trial motion decision by a predisposed (and preannounced) trial judge.

## VI(A).

## WYOMING LAW ON PEREMPTORY OR CHALLENGES OF JUDGES FOR CAUSE—PRESENT W.R.C.P. 40.1(b) AND W.R.Cr.P. 23(d) and (e)

The history of a peremptory right to change the trial judge was first introduced to Wyoming law by statute in 1877, thirteen years before statehood, and it, like a change of venue provision has had a somewhat rocky path in application; one reversal before statehood and none since regarding the discretionary right of the trial court to change venue. However, the change of judge itself was peremptory and the provision remained in Wyoming law except for a brief time when the statutorily adopted right was eliminated and, because of the vociferous objection of the trial bar to the change, then quickly reinstated. *See* Wyo. Sess.Laws § 1 (1877); Revised Statutes of Wyoming § 3400 (1877); *Story*, 788 P.2d 617; *Smallwood v. State*, 771 P.2d 798 (Wyo.1989); *Continental Ins. Co. v. First*

*Wyoming Bank, N.A.,* 771 P.2d 374 (Wyo. 1989); *Blanchard v. Blanchard,* 770 P.2d 227 (Wyo.1989); *Garnett v. State,* 769 P.2d 371 (Wyo.1989); *Lozano v. State,* 751 P.2d 1326 (Wyo.1988); *Cordova v. Gosar,* 719 P.2d 625 (Wyo.1986); *Pote v. State,* 695 P.2d 617 (Wyo.1985); *Kobos By and Through Kobos v. Sugden,* 694 P.2d 110 (Wyo.1985); *Osborn v. Manning,* 685 P.2d 1121 (Wyo.1984); *Hopkinson,* 679 P.2d 1008; *Grubbs v. State,* 669 P.2d 929 (Wyo. 1983); *Kimbley v. City of Green River,* 663 P.2d 871 (Wyo.1983); *Norman v. City of Gillette,* 658 P.2d 697 (Wyo.1983); *Osborne v. District Court of Ninth Judicial Dist.,* 654 P.2d 124 (Wyo.1982); *Cline,* 600 P.2d 725; *Smith v. State,* 598 P.2d 1389 (Wyo.1979); *Meyer v. Meyer,* 538 P.2d 293 (Wyo,1975); *Barbour v. Barbour,* 518 P.2d 12 (Wyo.1974); *S–Creek Ranch, Inc. v. Monier & Co.,* 518 P.2d 930 (Wyo.1974); *Rhoads v. Gilliland,* 514 P.2d 202 (Wyo. 1973); *State ex rel. Johnston v. District Court of Platte County,* 495 P.2d 255 (Wyo.1972); *Higby v. State,* 485 P.2d 380 (Wyo.1971); *Leitner v. Lonabaugh,* 402 P.2d 713 (Wyo.1965); *Stroup v. City of Sheridan,* 392 P.2d 517 (Wyo.1964); *State ex rel. Petro v. District Court of Sheridan County,* 389 P.2d 921 (Wyo.1964); *In re Greybull Valley Irr. Dist.,* 52 Wyo. 479, 76 P.2d 339, *reh'g denied* 52 Wyo. 479, 77 P.2d 617 (1938); *Washakie Livestock Loan Co. v. Meigh,* 47 Wyo. 161, 33 P.2d 922 (1934); *Tucker v. State ex rel. Snow,* 35 Wyo. 430, 251 P. 460 (1926); *Aspoli v. State,* 22 Wyo. 210, 137 P. 577 (1914); *Murdica v. State,* 22 Wyo. 196, 137 P. 574 (1914); *Huhn v. Quinn,* 21 Wyo. 51, 128 P. 514 (1912); *Ross v. State,* 8 Wyo. 351, 57 P. 924 (1899); *In re Moore,* 4 Wyo. 98, 31 P. 980 (1893); and *Dolan v. Church,* 1 Wyo. 187 (1875). *See also* Comment, *Civil and Criminal Procedure—Disqualification of District Judges for Prejudice in Wyoming,* VI Land & Water L.Rev. 743 (1971) and Larson, *Exiling a Wyoming Judge,* 10 Wyo.L.J. 171 (1956).

The apparent weight or the assumed balance in the Wyoming case law seems to clearly favor institutional solidity and disfavor challenges to the bias or prejudice of the trial judge. The standards provided by this nation's case law and authoritative texts are not equivalently restrictive. For reasons not clarified in case or historical information, this court's rules, W.R.C.P. 40.1(b) and W.R.Cr.P. 23(d), are procedurally different.

The Wyoming civil rule provides:

(1) Peremptory Disqualification.—A district judge may be peremptorily disqualified from acting in a case by the filing of a motion requesting that he be so disqualified. The motion shall be filed by a plaintiff at the time the complaint is filed, designating the judge to be disqualified. The motion shall be filed by a defendant at or before the time the first responsive pleading is filed by him or within thirty (30) days after service of the complaint on him, whichever first occurs. One made a party to an action subsequent to the filing of the first responsive pleading by a defendant cannot peremptorily disqualify a judge. In any matter, a party may exercise the peremptory disqualification only one (1) time and against one (1) judge.

(2) Disqualification for Cause.—Whenever the grounds for such motion become known, any party may move for a change of district judge on the ground that the presiding judge (A) has been engaged as counsel in the action prior to his election or appointment as judge, (B) is interested in the action, (C) is related by consanguinity to a party, (D) is a material witness in the action, or (E) is biased or prejudiced against the party or his counsel. The motion shall be supported by an affidavit or affidavits of any person or persons, stating sufficient facts to show the existence of such grounds. Prior to a hearing on the motion any party may file counter-affidavits. The presiding judge shall rule on the motion and if he grants the same shall immediately call in another district judge to try the action.

(3) Effect of Ruling.—A ruling on a motion for a change of district judge shall not be an appealable order, but the ruling shall be entered on the docket and made a part of the record and may be

assigned as error in an appeal of the case.

(4) Motion by Judge.—The presiding judge may at any time on his own motion order a change of judge when it appears that the ends of justice would be promoted thereby.

(5) Probate Matters.—In any controverted matter arising in a probate proceeding, a change of judge, or in cases where a jury is demandable, a transfer of trial, or both, may be had for any cause authorizing such change in a civil action. The procedure for such change shall be in accordance with this rule. Except for the determination of such controverted matter, the judge having original jurisdiction of such probate proceeding shall retain jurisdiction in all other matters in connection with said proceeding.

W.R.C.P. 40.1(b). The criminal rule is differently stated:

(d) *Peremptory disqualification.*—A district judge may be peremptorily disqualified from acting in a case by the filing of a motion requesting that he be so disqualified. The motion shall be filed by the state at the time the information or indictment is filed, designating the judge to be disqualified. The motion shall be filed by a defendant at the time of his arraignment and following the entry of his plea, designating the judge to be disqualified. In any matter, a party may exercise the peremptory disqualification only one (1) time and against only one (1) judge.

(e) *Disqualification for cause.*—Whenever the grounds for such motion become known, the state or the defendant may move for a change of district judge on the ground that the presiding judge is biased or prejudiced against the state, the prosecuting attorney, the defendant or his attorney. The motion shall be supported by an affidavit or affidavits of any person or persons stating sufficient facts to show the existence of such ground. Prior to a hearing on the motion any party may file counter-affidavits. The presiding judge shall rule on the motion, and if he grants the same shall immediately call in another district judge to try the action. A ruling on a motion for a change of district judge shall not be an appealable order, but the ruling shall be entered on the docket and made a part of the record, and may be assigned as error in an appeal of the case.

W.R.Cr.P. 23.

### VI(B).

### INVALIDITY OF PRECEDENT CITED BY MAJORITY

The cases cited by the majority lack both comparability and persuasion for the factual situation presented here. *Ingram v. Grimes,* 213 Ga. 652, 100 S.E.2d 914 (1957) cannot be applied factually since the challenged comment of the court came after the verdict which, under the law of the State of Georgia, *would have* disqualified him from presiding at a subsequent retrial of the case. The issue presented was disqualification to enter the sentence and involved nothing in the nature of new evidence or a hearing relating to a new trial. *Johnson v. State,* 46 Ga.App. 494, 167 S.E. 900 (1933) is no more helpful since the finite decision of the appellate court was to reverse the trial court in denial of the new trial and then since a new trial was granted on another ground, the judge by statute would be disqualified from presiding at that retrial.

A jocular comment as "an attempt at levity to ease the tensions * * * of the case" did not suffice for mandatory recusal in *Shaw v. State,* 276 S.C. 190, 277 S.E.2d 140, 141 (1981). Nevertheless, a different judge conducted the post-conviction relief proceeding in the case. A bail hearing determination required by rule provided standards in advance of the jury trial is likewise neither comparable nor relevant. *Com. v. Strunge,* 287 Pa.Super. 212, 429 A.2d 1176 (1981). Similarly, I would then reject the last citation where the only issue raised as a bias argument involved the trial judge's knowledge of the prior record of the defendant. *State v. Kimmel,* 202 Kan. 303, 448 P.2d 19 (1968). Any reasonable faith in judicial fairness and practical facts

recognize that in areas of small population like Wyoming, the judge is exposed to a generic knowledge of persons who come into court as participants in the community society.

The foregoing cases provided the total authority utilized by the majority to establish judicial rules regarding ethics, bias and predetermination. The opinion of this court, dicta or volunteered as it may be, raises issues of future use and relevance which pose most serious concerns and particularly so if used not only to palliate what happened here but to set a standard for future application and interpretation of the 1990 Wyoming Code of Judicial Conduct.

### VI(C).

### THE LAW OF THE UNITED STATES TODAY

Contrary to the suggestion in the majority, there is a *very large* reservoir of authority. First, I find the cases cited to justify the trial judge's retention of the case for retrial both non-persuasive and inapplicable. Secondly, consideration of the self-judging standard is severely limited in a fashion not recognized by the broadly stated conclusion that the trial judge has the right to consider the legal sufficiency of facts alleged to require his disqualification. Third, little or no current authority retains the forsaken explication that a trial judge has a duty to serve for justification that a biased or prejudiced adjudicator should remain on the case. Duty to serve is no longer justification for non-recusal. The question is the existence of a preclusive attitude of unfairness otherwise characterized as bias or prejudice or just prejudgment before listening to the facts to be presented. Impartiality and open-mindedness of the trial judge is an absolute right for the litigant and an indispensable standard within the justice delivery system.

This is a case on its facts if the subject had been briefed and presented for appeal where the trial court may have first expressed a finite opinion on guilt to a trial juror after rendition of the verdict and while an appeal was pending and then pro-vided an adjudicatory decision on the subject of recantation as a measure of his opinion substantially in advance of the hearing held on the motion for new trial. Within the concept of the cases now postured for resolution of rules for future cases, the issue is prejudgment.

There is a current Colorado case with similar facts which is finitely in point. *Estep v. Hardeman*, 705 P.2d 523 (Colo.1985) has almost the same identical factual situation, except in *Estep*, the judge's views were communicated to counsel. Here, they were not known until the day of the hearing in one regard and in the second regard, not until substantially after the decision. *Estep* involved a motion for a new trial. The importance of the credibility of the witness who had been subject to the advance denied credibility was obvious. The appellate court recognized that premature questioning of the credibility of a potential witness was legally sufficient to require trial court disqualification prior to the hearing on the motion for the new trial.

> The tenor and import of the judge's comment regarding the credibility of Estep's [petitioner] prospective witnesses were such as to constitute a premature determination that the witnesses were not truthful and suggest a predisposition on the respondent's [judge] part to deny the petitioner's motion for post-conviction relief. Such a predisposition regarding the credibility of potential witnesses, at a time when no testimony has yet been offered by those witnesses, can only frustrate the goal of providing the petitioner with a meaningful hearing before an impartial tribunal. Prejudgments regarding the quality of evidence to be heard are not consistent with the duty of the trial court to reach an unbiased decision after weighing all the evidence.

*Id.* at 526–27 (footnotes omitted).

For further review, a valuable and considerate discussion is provided by Lewis, *Systemic Due Process: Procedural Concepts and the Problem of Recusal*, 38 U. of Kan.L.Rev. 381 (1990). Included in part in the author's broad evaluation was the statement:

An independent and impartial decision-maker is crucial to the effective functioning of our justice system. As former California Supreme Court Chief Justice Roger Traynor stated before the Senate Judiciary Committee, "[a]n independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." A biased judiciary threatens the legitimacy of the entire legal process. Over one hundred years ago a court noted that lack of judicial impartiality extends beyond its effect on the parties to question the integrity of the entire judicial system:

> "[T]he Court ought not to be astute to discover refined and subtle distinctions to save a case from the operation of the maxim, ['No one can be a judge in his own cause'] when the principle it embodies bespeaks the propriety of its application. The immediate rights of the litigants are not the only objects of the rule. A sound public policy, which is interested in preserving every tribunal appointed by law from discredit, imperiously demands its observance."

In light of the inconsistent application of existing recusal standards, a new recusal approach is needed that will apply uniform rules to all areas of judicial impropriety. When a biased decisionmaker sits, the legal process loses its legitimacy. Thus, protections against abuses of judicial bias or relationship are as necessary as safeguards against abuse of pecuniary interest.

*Id.* at 409–10 (quoting *Stockwell v. Township Bd.*, 22 Mich. 341, 350 (1871) and footnotes omitted).

The Alaska court in *Perotti v. State*, 806 P.2d 325, 327 (Alaska App.1991) recently re-emphasized in consideration of Canon 3(C)(1) of the Code of Judicial Conduct that the requirement of disqualification " 'in a proceedings in which his impartiality might reasonably be questioned' " requires also an analysis that "is likely to flow from participation in the case at issue." This is the close relationship between actual and apparent impartiality and is found in the objective standard of public perception.

A particular question of bias and prejudice presented here is pre-hearing or pre-trial statements showing mind-set or factual opinion. One source for characterization and categorization, after first recognizing the non-applicability of what may have occurred during the trial or hearing process itself, is 48A C.J.S. *Judges* § 117 (1981). "On the other hand it is generally held that the exhibition of partisan feeling, or the unnecessary expression of opinion, showing bias or prejudice, or on appearance thereof, or a prejudgment of the matter in issue *will disqualify a judge.*" *Id.* at 770–71 (emphasis added).

Some reference to the voluminous nature of the case law is required to address this subject of a determined and stated opinion in advance of hearing by the trial judge.[11] Under certain circumstances, a trial judge is required to raise the issue of disqualification on his own motion. One such case is where the defendant or his attorney was not present when the statement was made reflecting predecision or prejudgment of the court on a significant issue. *See People v. Gibson*, 90 Mich.App. 792, 282 N.W.2d 483 (1979) and *People v. Dixson*, 403 Mich. 106, 267 N.W.2d 423 (1978). *See also Doe v. State*, 91 N.M. 51, 570 P.2d 589 (1977).

It is apparent that two differentiated standards have developed. One requires recusal when a reasonable judge would find it necessary to do so. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580,

---

**11.** I do not include the authorities which raise the different and parallel issues of pecuniary interest. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986); *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct.

437, 71 L.Ed. 749 (1927). Obviously, *Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) directly involves ethical standard factors from pre-hearing statements. *See also State v. American TV and Appliance of Madison, Inc.*, 151 Wis.2d 175, 443 N.W.2d 662 (1989).

89 L.Ed.2d 823 (1986). This approach is analyzed from a due process criteria related to the established effect on the litigant. *Aetna Life Ins. Co.*, 475 U.S. at 825, 106 S.Ct. at 1587; *United States v. Couch*, 896 F.2d 78 (5th Cir.1990).

The other standard requires disqualification in any proceeding in which his impartiality might reasonably be questioned as a matter of public perception. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *Couch*, 896 F.2d at 82. A justice must satisfy the appearance of justice, *Matter of Yagman*, 796 F.2d 1165, *opinion amended and reh'g denied* 803 F.2d 1085 (1986), *mandamus granted* 815 F.2d 575 (9th Cir.), *cert. denied* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987); *United States v. Diaz*, 797 F.2d 99 (2nd Cir.1986). This second standard is now specifically restated in the American Bar Association Code and adopted by this state as the 1990 Wyoming Code of Judicial Conduct. It is explicitly stated in Canon 3(E)(1)(a) an appropriate commentary. *See State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692 (Mo. App.1990), which included a discussion of the Canons of Judicial Conduct. This approach develops from a standard of the maintenance of a proper public perception and the intrinsic reliability, validity and integrity of the judiciary.[12]

There is a corollary rule also firmly established that the challenged judge will not determine contested issues of fact directed to request recusal. If adequate facts are alleged as a criteria of judicial conduct to require recusal, immediate action to withdraw is required. Truthfulness of the facts cannot be questioned by the judge. *Lester v. Com.*, 250 Ky. 227, 62 S.W.2d 469 (1933). This rule has an extended history. *Dickenson v. Parks*, 104 Fla. 577, 140 So. 459 (1932). *Cf. Berry v. Berry*, 654 S.W.2d 155 (Mo.App.1983). If any factual inquiry

is required or provided, another judge should be called for hearing or decision. *Orderville Irr. Co. v. Glendale Irr. Co.*, 17 Utah.2d 282, 409 P.2d 616 (1965).

### VI(D).

### EVIDENCED PREDETERMINATION BY ANY RULE REQUIRES REVERSAL

Unacceptable trial court predisposition is catalogued in the cases in a multitude of ways, although every case addresses the same goal—an impartial trial court who has not determined the pending matter in advance of the decisional hearing or trial. *Burrows v. Forrest City*, 260 Ark. 712, 543 S.W.2d 488, 490 (1976) involved a suspended sentence revocation where the exasperated judge told counsel in advance " 'that Defendant should bring his toothbrush with him because if he is found guilty, he is going straight to jail' ". Along with other comments, the appellate court found "the trial judge's impartiality in the exercise of his judicial discretion was impaired." *Id.* 543 S.W.2d at 493.

In the New York case of *Sherk v. Catena*, 235 A.D. 686, 255 N.Y.S. 315, 316 (1932), the trial court at the end of retrial stated that " '[t]he retrial of this case only confirms the conviction that I had on the first trial that neither of the defendants is worthy of belief. They would both swear to anything.' " The supreme court then recognized:

> It is obvious, from such statements, that the trial justice was biased and prejudiced against said defendants at the commencement of the second trial. Under the circumstances, we think they were entitled to have the case tried before another justice, and that their motion to that effect should have been granted.

*Id.* 255 N.Y.S. at 316.

The trial court calling the defendants "bad bastards" at the close of prosecution

---

**12.** Our legal system is based on the principle that an independent, fair, and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law.

Wyoming Code of Judicial Conduct, Preamble (1990).

was not acceptable in *State v. Nordstrom*, 122 R.I. 412, 408 A.2d 601, 602–03 (1979):

> Although the evidence submitted during the course of the state's presentation would warrant a person of ordinary sensibilities to be horrified at the conduct ascribed to the various defendants by prosecution witnesses, it is a familiar principle that judicial officers must keep their minds open until the entire case is concluded and arguments of counsel have been heard. This duty often runs counter to natural human reaction. Nevertheless, it is required in order to vindicate our system of criminal adjudication. We are thus constrained to conclude that the defendants were entitled to the granting of their motion for mistrial under the circumstances of this case.

Similarly proscribed was the open public comment of the court in advance of the disbarment hearing that " 'I'm going to disbar [the attorney] if it's the last thing I ever do.' " *Clarke v. Com.*, 259 Ky. 572, 82 S.W.2d 823, 823 (1935). (He did not: it was the last thing he ever did—at least for that subject). The appellate court recognized:

> If, in fact, the judge did make the remark attributed to him, and under our well-established rule it must be taken as true, it indicated he had already prejudged the case against [the attorney], and he should have vacated the bench.

*Id.* 82 S.W.2d at 823–24. *See likewise Givens v. Lord Crawshaw*, 21 Ky.L.Rptr. 1618, 55 S.W. 905, 907 (1900), where the only truth found by the trial judge in the evaluation of the condemning affidavit was that the litigant "was a bolter", e.g., had not supported the judge in the prior election. Denial of recusal was rejected on appeal and the adverse judgment reversed.

> It is a part of the current history of the day that severe antagonisms often occur between bolters and regulars, and that, too, without any desire or intention upon the part of either to wrong the other. It seems to us that, under all the circumstances, the trial judge should have vacated the bench, and permitted the selec-

tion of another judge. The final judgment rendered in this case is erroneous.

*Id.* 55 S.W. at 907.

" '[Y]ou can call all the witnesses you want, but * * * ' " resulted in like effect in *Ross v. State*, 267 Ark. 1027, 593 S.W.2d 475, 478 (1980). *See Leonard v. Willcox*, 101 Vt. 195, 142 A. 762 (1928), a case similar in admitted predisposition. Impatience and predisposition were considered in reversal in *State v. Lovelady*, 691 S.W.2d 364, 367–68 (Mo.App.1985):

> There are two related features in this cause which called for the sustention of the motion for disqualification. The first feature is the judge's positive and emphatic pronouncements with reference to the tendered defense of mental disease or defect excluding responsibility, and the motions for mental examinations.
>
> \*   \*   \*   \*   \*   \*
>
> The second feature which is conspicuous in this record is the judge's undisguised impatience with the defense attorneys, and with Mr. Locascio in particular, which seemed to be caused by the latter's assertion of the mental disease or defect defense and his filing of the motions for the mental examinations.

An intent expressed in advance adverse to the state dictated recusal in *Leighton v. Henderson*, 220 Tenn. 91, 414 S.W.2d 419, 421 (1967) (quoting *In re Cameron*, 126 Tenn. 614, 151 S.W. 64, 76–77 (1912)):

> " * * * The fundamental principle is that parties litigant are entitled to an impartial judge. * * * But it is of immense importance, not only that justice shall be administered to men, but that they shall have no sound reason for supposing that it is not administered. * * * We say it is a fundamental principle that the judge shall be impartial. * * *
>
> "Beyond question it is not according to due course of law to compel a man over his protest to try his case before a judge who has already decided it, and has announced that decision in advance of the hearing. It is equally true that such compulsion is a denial of justice. * * *
>
> " * * * It would have been far safer, however, and more in accordance with

the proprieties of the situation, after having formulated the charges (in the form of charges and not of decision), to have interchanged with some other judge to try the case, in view of the personal feeling which he entertained by reason of the gross discourtesy to which he had been subjected by counsel in the matters leading up to the present controversy. He did not, however, do this, nor was he bound to do so; but he was bound not to decide the case in advance, either orally or by a decision put upon the record, as shown by his language copied into this opinion. Having so decided the matter, he immediately became incompetent to try it."

The volume of these cases enunciate a difference between an undisclosed attitude which is in the nature of the human being, whether or not a jurist, and the disclosed decision before final receipt of all of the evidence.

An expression of opinion by a judge upon a question of law does not disqualify him upon another hearing of the case. * * * But Judge Willcox, in all of the proceedings before him, sat as a trier of fact. It has been held that, while an opinion held by a juror as to the merits of the case upon which he is called to sit will not disqualify him, the expression of that opinion will do so. * * *

\* \* \* \* \* \*

* * * When a judge feels and expresses doubt that any evidence covering matters which have transpired since a former hearing of the same issue, the purport of which he does not know, but which, presumably, is material and relevant, will change his conviction then reached, he has admitted his bias, and has disqualified himself from proceeding further in the hearing. A litigant ought not to be compelled to submit to a judge who has already confessedly prejudged him, and who is candid enough to announce his decision in advance, and his serious doubt that he would do otherwise than adhere to it, no matter what the evidence might be. * * *

This is a matter which does not alone concern the parties to this litigation. *Leonard,* 142 A. at 772.

"The right of every person accused of crime to have a fair and impartial trial, before an unbiased court and an unprejudiced jury, is a fundamental principle of criminal jurisprudence" * * *. Not only must there be no prejudice, actual or implied, but even the appearance of prejudice must be avoided. "Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge" * * *.

*People v. Greenfield Const. Co., Inc.,* 48 A.D.2d 765, 368 N.Y.S.2d 89, 90 (1975) (quoting *People v. McLaughlin,* 150 N.Y. 365, 375, 44 N.E. 1017, 1019 (1896); *People v. Suffolk Common Pleas,* 18 Wend. 550, 552 (1836); and *People v. Naimark,* 154 A.D. 760, 764, 139 N.Y.S. 418, 420 (1913)).

It is not any better if when sentencing the trial court references extraneous sources and says, " 'so I heard considerable about him, and therefore I feel it unnecessary to have a pre-sentence investigation and I am ready to sentence.'" *Com. v. Schwartz,* 267 Pa.Super. 170, 406 A.2d 573, 574 (1979).

The Florida courts have a consistent course of cases reversing for recusal failure following statements evidencing prejudgment. See, for example, *Brown v. Rowe,* 96 Fla. 289, 118 So. 9, 9 (1928)— providing the trial judges statement, " 'things are not just right, and I am going to pull the shirt off [of the defendant], and it might take the hide * * * with it[.]'" The general rule was then stated on appeal: "Where a statutory disqualification is sufficiently alleged, the judge should not adjudicate the case." *Id.* at 10.

*Dickenson,* 140 So. at 462 stated:

It was proper for [the judge] to examine the affidavit for the purpose of determining whether or not it met all the requirements of the statute and to determine its legal sufficiency. He has no right to pass upon the truth or falsity of the facts alleged therein; neither can he

adjudicate the question of his disqualification. If he finds the affidavit legally sufficient, he is left with no alternative but to retire from the cause, as directed by the statute. *Berger et al. v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *Suarez v. State,* 95 Fla. 42, 115 So. 519.

*See likewise State ex rel. Arnold v. Revels,* 113 So.2d 218, 223 (Fla.App.1959) (quoting *State ex rel. Davis v. Parks,* 141 Fla. 516, 194 So. 613, 615 (1939); *State v. Steele,* 348 So.2d 398 (Fla.App.1977); *Irwin v. Marko,* 417 So.2d 1108, *reh'g denied* 419 So.2d 1198 (Fla.App.1982); and *Dickenson,* 140 So. at 462), a proceeding where the supreme court set forth:

"This Court is committed to the doctrine that every litigant is entitled to nothing less than the cold neutrality of an impartial judge. It is the duty of Courts to scrupulously guard this right and to refrain from attempting to exercise jurisdiction in any matter where his disqualification to do so is seriously brought in question. The exercise of any other policy tends to discredit the judiciary and shadow the administration of justice.

\*    \*    \*    \*    \*    \*

" \* \* \* There is no reason why he should not and every reason why he should excuse himself under the circumstances."

\*    \*    \*    \*    \*    \*

"Prejudice of a judge is a delicate question to raise, but, when raised as a bar to the trial of a cause, if predicated on grounds with a modicum of reason, the judge against whom raised, should be prompt to recuse himself. No judge under any circumstances is warranted in sitting in the trial of a cause whose neutrality is shadowed or even questioned."

Similar precluded continuation of the trial court after prejudgment statements is found in federal cases: *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *cf. In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *United States v. Massey,* 594 F.2d 676 (8th Cir.1979); *United States v. Womack,* 454 F.2d 1337, 1341 (5th Cir.1972), providing reference to another case where the defendant was referred to "as a man 'who everybody admits was certainly a shady character[.]' "; *Knapp v. Kinsey,* 232 F.2d 458, 465, *reh'g denied* 235 F.2d 129 (6th Cir.), *cert. denied* 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956); *Connelly v. United States Dist. Court In and For the Southern Dist. of Cal., Cen. Div.,* 191 F.2d 692 (9th Cir.1951), open hostility and predetermination mandated recusal in the politically sensitive case; and *Moskun v. United States,* 143 F.2d 129 (6th Cir.1944). Predisposition and trial partisanship was addressed in *Knapp,* 232 F.2d at 465:

One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of actual bias or prejudice in the trial of the case. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, [625], 99 L.Ed. 942; *Talbert v. Muskegon Construction Co.,* 305 Mich. 345, 348, 9 N.W.2d 572. If this basic principle is violated, the judgment must be reversed. *In re Murchison, supra; Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481; *Moskun v. United States,* 6 Cir., 143 F.2d 129, 130; *N.L.R.B. v. Phelps,* 5 Cir., 136 F.2d 562.

Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts or statements on his part. Or it may appear during the trial by reason of the actions of the judge in the conduct of the trial. If it is known to exist before the trial it furnishes the basis for disqualification of the judge to conduct the trial.

Illustrative state decisions within the voluminous precedent include: *People ex rel. Przybylinski v. Scott,* 19 Ill.2d 500, 167 N.E.2d 194 (1960); *Noel State Bank v. Blakely Real Estate Improvement Corporation,* 321 Ill.App. 594, 53 N.E.2d 621 (1944), a statement indicating predisposition of guilt.

In referencing the earlier case of *London v. Ogden,* 130 Okl. 89, 265 P. 139 (1928), the consensus rule is recited in

*Hearn v. Miller,* 168 Okl. 411, 33 P.2d 506, 507 (1934):

> While the respondent insists that he is not unfriendly to the petitioners, and that he can afford a fair and impartial trial, and while we do not doubt his sincerity in this regard, yet the question is not so much whether he feels and insists that he would be able to give a fair and impartial trial, as it is whether his utterances and actions have been such as to preclude reasonable men from feeling that a fair and impartial trial, without bias or prejudice, could be had before him. The basic principle upon which the law rests is that every litigant is entitled to have his contentions heard and his rights determined by an impartial, unbiased, and unprejudiced tribunal. This language, in substance, was used and applied in *London v. Ogden, supra,* [130 Okl. 89, 265 P. 139], and it is a well-established rule by all of the authorities.

New Mexico, in quoting *Berger,* 255 U.S. at 36, 41 S.Ct. at 234, followed a similar pathway in *State ex rel. Anaya v. Scarborough,* 75 N.M. 702, 410 P.2d 732 (1966). That court first maintained:

> " * * * To commit to the judge a decision upon the truth of the facts gives chance for the evil against which the section is directed. The remedy by appeal is inadequate. It comes after the trial and if prejudice exist[s] it has worked its evil and a judgment of it in a reviewing tribunal is precarious. It goes there fortified by presumptions, and nothing can be more elusive of estimate or decision than a disposition of a mind in which there is a personal ingredient."

*Id.* 410 P.2d at 737. The court then quoted from the earlier case of *People ex rel. Burke v. District Court of Third Judicial Dist.,* 60 Colo. 1, 152 P. 149, 155 (1915):

> " * * * [I]f the alleged facts stated in the application for a change of judge be true, he may imperceptibly to himself, however honest and pure his intentions, be unable to give a fair and impartial trial to these defendants. Prejudice is a mental condition or status, not susceptible of direct and positive proof. As a

rule it is the result of no dishonest motives, and he whose acts are affected by prejudice is usually unconscious of its influence. The greatest delicacy should constantly be observed on the part of judges, to the end that they never act where there could be substantial doubt whether they would be free from bias. The courts must observe such proprieties, not only because they are right, 'but in order to retain public respect and secure willing and ready obedience to their judgments.' *Nordloh v. Packard,* 45 Colo. 515, 101 Pac. 787. 'Caesar demanded that his wife should not only be virtuous, but beyond suspicion; and the state should not be any less exacting with its judicial officers, in whose keeping are placed, not only the financial interests, but the honor, the liberty, and the lives of its citizens, and it should see to it that the scales in which the rights of the citizens are weighed should be nicely balanced, for, as was well said by Judge Bronson in *People v. Suffolk Com. Pleas,* 18 Wend. [N.Y.] 550: "Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge." ' *State ex rel. Barnard v. Board of Education* [19 Wash. 8, 52 P. 317, 40 L.R.A. 317], *supra.* * * * "

*Scarborough,* 410 P.2d at 738. See likewise, in concept and result, *Calhoun v. Superior Court of San Diego County,* 51 Cal.2d 257, 331 P.2d 648 (1958); *Geer v. Hall,* 138 Colo. 384, 333 P.2d 1040 (1958); and Comment, *supra,* VI Land & Water L.Rev. 743.

Completely different from the casualness with which the majority here approaches this most fundamental and serious concern of the justice delivery system, the Colorado Supreme Court in *Estep,* 705 P.2d at 525 considered the advance comment of the trial court regarding a prospective witness, " 'I hope this witness is more credible than your other witness.' " The other witness referred to by the trial court was an individual who had subsequently recanted his confession to the murder for which the

present defendant had been convicted. The Colorado Supreme Court recognized that:

"[B]asic to our system of justice is the precept that a judge must be free of all taint of bias and partiality." *People v. District Court*, 192 Colo. 503, 507, 560 P.2d 828, 831 (1977). This principle not only insures that "no person is forced to stand trial before a judge with a 'bent of mind,' " *People v. Botham*, 629 P.2d 589, 595 (Colo.1981), but also fosters public confidence in the judicial system:

"A trial judge must 'conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.' A.B.A. Standards, *The Function of the Trial Judge* 1.5. Courts must meticulously avoid any appearance of partiality, not merely to secure the confidence of the litigants immediately involved, but 'to retain public respect and secure willing and ready obedience to their judgments.' *Nordloh v. Packard*, 45 Colo. 515, 521, 101 P. 787, 790 (1909)."

*People v. District Court*, 192 Colo. 503, 508, 560 P.2d 828, 831–32 (1977) (footnote omitted). The Supreme Court has stated that "the tribunals of the country shall not only be impartial in the controversies submitted to them but shall give assurance that they are impartial * * *." *Berger v. United States*, 255 U.S. 22, 35–36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1921). Thus, either actual prejudice on the part of the trial judge or its mere appearance can require the disqualification of that judge. *People v. District Court*, 192 Colo. 503, 510, 560 P.2d 828, 833 (1977). *See also* Colorado Code of Judicial Conduct, Canon 3(C)(1) (judge should disqualify himself if his impartiality might reasonably be questioned).

In assessing a motion to disqualify, a trial court is limited to an inquiry into the legal sufficiency of the motion and accompanying affidavits, and their timeliness. Thus, the trial judge engaging in this inquiry "cannot pass upon the truth or falsity or statements of fact in the motion and supporting affidavits." *People v. District Court*, 192 Colo. 503, 508, 560 P.2d 828, 832 (1977). These state-

ments of fact must be accepted as true by the court, *People v. Botham*, 629 P.2d 589 (Colo.1981); *Carr v. Barnes*, 196 Colo. 70, 580 P.2d 803 (1978), and denials or explanations by the respondent judge cannot be considered by this court in evaluating such motions. *People v. District Court*, 192 Colo. 503, 509 n. 2, 560 P.2d 828, 832 n. 2 (1977).

We have previously formulated the test for the legal sufficiency of the motion to disqualify as follows:

"To be legally sufficient, the motion and affidavits must state facts from which it may reasonably be inferred that the judge has a bias or prejudice that will prevent him from dealing fairly with the defendant. The affidavits in support of the motion do not have to contain every essential fact which establishes the judge's prejudice. It is sufficient if the affidavits verify the facts set forth in the motion."

*People v. Botham*, 629 P.2d 589, 595 (Colo.1981) (citations omitted). The application of this standard enables the Colorado judicial system "to eliminate every semblance of *reasonable* doubt or suspicion that a trial by a fair and impartial tribunal may be denied." *Johnson v. District Court*, 674 P.2d 952, 956 (Colo. 1984) (emphasis in original) * * *.

*Estep*, 705 P.2d at 525–26. *See Papa v. New Haven Federation of Teachers*, 186 Conn. 725, 444 A.2d 196 (1982); *State v. Pruett*, 213 Kan. 41, 515 P.2d 1051 (1973); *Com. v. Coleman*, 390 Mass. 797, 461 N.E.2d 157 (1984); *Doe*, 570 P.2d 589; *Sardino v. State Com'n on Judicial Conduct*, 58 N.Y.2d 286, 461 N.Y.S.2d 229, 231, 448 N.E.2d 83, 85 (1983); and *Com. v. Bryant*, 328 Pa.Super. 1, 476 A.2d 422 (1984).

A somewhat extreme illustration was found in *Walker v. Lockhart*, 763 F.2d 942 (8th Cir.1985), *cert. denied* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986), where the defendant was first convicted of murder (*Walker v. State*, 239 Ark. 172, 388 S.W.2d 13 (1965)), and then on retrial, defendant's counsel moved to disqualify the same trial judge.

The defense presented uncontradicted evidence that the judge, after granting Walker's request to go to church to be baptized, had instructed the deputy sheriff that if Walker "made a move to shoot him down, because he didn't want him brought back to him because he intended to burn the S.O.B. anyway."

*Walker*, 763 F.2d at 946. For this and other reasons, the district court was reversed and directed to grant a writ of habeas corpus unless the defendant was retried.

We should not lightly abandon an absolute dedication to the fundamental constitutional tenant of a judiciary in a democratic society which requires a fair, impartial and open-minded judge and availability of an impartial and non-prejudicial jury. *Amin v. State*, 811 P.2d 255 (Wyo.1991), Urbigkit, C.J., dissenting. Those guarantees surely, even today, are not to be questioned within our state's and nation's guarantees as emphatically written in our Bill of Rights.

Since we set out to establish standards for recusal, disqualification and judicial conduct by discussion in this case, I would alternatively submit a modern consensus standard derived from current law within the general character of questioned bias, prejudice or prejudgment:

1. Time limitations on peremptory or challenges for cause addressing judicial disqualification or recusal are mandatory. Requests or motions should be filed at the earliest reasonable time when knowledge for action is available to the litigant or the litigant's attorney.

2. Normal decisions involving questions of law made during the process of the civil or criminal proceeding are not bases for arguable bias or usable for challenge for cause. If decisions regarding matters of law are wrong, appellate reversal and not trial disqualification serves as the due process remedy.

3. In assessing a motion to disqualify, whether peremptory or for cause, the trial court is limited to inquiry into the legal sufficiency of the motion, supporting documents if any, including accompanying affidavits, and timeliness. The trial judge, engaging in the inquiry, cannot pass upon the truth or falsity of statements of fact which must be accepted as true for the purpose of decision on a motion for recusal or disqualification.

4. The test for judicial participation in a case is assurance of fairness and impartiality to be judged by an objective public perception standard. No judge is warranted in setting on the trial of a cause where his or her impartiality might reasonably be questioned.

5. Any announced position evidencing significant factual predetermination by the trial judge before holding evidentiary hearings requires recusal or justifies disqualification.

## VII.

## CONCLUSION

I find neither need nor justice required to restrict the historical Wyoming rule for new trials effectively continued since enunciation in *Opie* in 1967 until today. This is true even when the change is propagated in order to justify a result-oriented decision directed to avoid jury consideration of perjury issues followed by principal witness recantation developed in the highly emotional character of contended parental sexual abuse of a teenage daughter.

## ADDENDUM

Following initial circulation of this dissent, the justice who authored the majority opinion next circulated his response to the dissent in the form of the concurrence. This was followed by the dissent of Justice Thomas which completed the initial drafting sequence.

Modest editing has now been made in the first section of this dissent to remove language which offended, apparently personally, the author of the majority opinion. Otherwise, this dissent remains essentially the same as originally prepared.

The circumstance now presented is that the concurrence wants to argue contention about the facts while the dissent, except for one basic reality, addresses the law. The basic reality is that if the offense

charged in the complaint did occur, it did not occur when the recanting prosecutrix first testified that it did before she later changed her testimony in stating that the offense did not occur.

Within the histrionics now developed, this appeal presents two significant subjects and legal principles. They are: (1) the majority opinion characterization of the *Opie* test as inadequate; and (2) volume of the case law considering the significance of the sole witness recantation. *York*, 704 P.2d 1252 and the singular volume of cases cited in the dissent are not novelties when comprehensive legal research of the authorities are pursued.

The recent CBS news program, 60 Minutes, again reminds us that innocent people are incarcerated following conviction by erroneous testimony. I believe the law should provide realistic opportunity when an innocent person may have been convicted to pursue correction of that terrible error. The Wyoming rules, W.R.C.P. 59 and 60 and W.R.Cr.P. 34, follow the Anglo Saxon history of the common law to provide that corrective opportunity. I continue to follow the philosophic principles of those rules and the legal history of our contemporary society in the search for procedural principles addressing access to justice.

Nothing stated in the concurrence in response to this dissent has changed my conclusion that this court should have reversed the denial of a new trial based on the emphatic change in testimony by the principal witness and remanded for jury retrial with whatever result then might occur. If the evidence is so strong, another conviction could result. *United States v. Wallach*, 935 F.2d 445 (2nd Cir.1991); Berman & Carroll, *Witness Recantation—How Does it Affect a Judgment of Conviction?*, XXXV N.Y.L.Sch.L.Rev. 593 (1990).

I would reverse and remand for retrial.

THOMAS, Justice, dissenting.

I would reverse the order of the trial court denying Brown's motion for a new trial. I would do that for two reasons.

First, I believe that the motion for a new trial should have been granted as a matter of justice. Second, I believe that the adaptation of the test from *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928), as gloss upon the rule articulated in *Opie v. State*, 422 P.2d 84 (Wyo.1967), converts our standard for evaluating a motion for a new trial premised upon newly discovered evidence from an objective to a subjective standard. In doing so, we transfer the task of evaluating the credibility of a witness from the jury in arriving at its determination of guilt or innocence to the presiding judge who makes the determination with all of the testimony available after the jury has made the determination without having the complete story of the witness.

Addressing first the matter of justice, my reflection leads to the conclusion that our system of criminal justice empowered MCX to bring about her father's incarceration. While other testimony and evidence usually appears to corroborate the accusation of a complaining witness, without the accusation there would be no *corpus delicti* to corroborate. Not infrequently convictions are had, and sustained, based solely upon the testimony of the complaining witness. That is the nature of the empowerment that flows to a victim from our system. My position is that, if the system empowers one to achieve a conviction by complaining to law enforcement authorities and then testifying in court, a balance in the scales of justice requires that the same empowerment be extended to set aside the conviction. Because of the nature of these charges, only MCX and Brown know with certainty whether the criminal conduct occurred. Brown, on this record, was steadfast in denial. MCX, after first testifying that the criminal conduct occurred, now states, presumably after being advised of the consequences of perjury, that it did not occur. I believe that justice demands that the same fact finder be afforded an opportunity to weigh the issue of credibility with the entire story before it, and a new trial affords that opportunity. This is how the power of the victim should be balanced.

With respect to the adjustment in the *Opie* test, I am satisfied that the test has

served the court well for almost twenty-five years. It has been utilized in both civil[1] and criminal cases.[2] Our application of the test has been consistent. We have uniformly required that all four aspects of the *Opie* test be satisfied before we can consider an abuse of discretion. Those requirements have not been adjusted, and they are set forth in *Opie*, as adopted from *United States v. Johnson*, 142 F.2d 588, 592 (7th Cir.1944), *cert. dismissed* 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944), as follows:

" * * * (1) That the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial." *Opie*, 422 P.2d at 85.

There can be little question in this case that the admission of perjury on the part of MCX came to Brown's attention after his trial. In light of the pre-trial assertions of MCX, it obviously was not owing to the want of due diligence that Brown did not learn of it sooner. It clearly is so material that it would probably produce a different verdict if the new trial should be granted. It is so different from the evidence introduced by the State at trial that it cannot be perceived as cumulative. All four of the *Opie* criteria are satisfied in this instance. The thrust of the majority opinion is that the presence of those factors makes no

difference if the trial judge determines that the recantation is false.

Our authorities are clear that we must identify an abuse of discretion on the part of the trial court if we are to reverse the order denying the motion for a new trial. I would find such an abuse of discretion in the adoption, in effect, of the *Larrison* test by the trial court when it concluded to reject the new evidence on the ground that it is false. When the trial court reached that conclusion after the hearing at which MCX testified in support of the motion for a new trial, a subjective test was adopted in lieu of the objective standard captured in *Opie*. If *Larrison* is not the law, then there was an abuse of the trial court's discretion.

In several cases, this court has dealt with the problem of recantation as newly discovered evidence relying on the *Opie* test. *Lacey v. State*, 803 P.2d 1364 (Wyo.1990); *Burns v. State*, 574 P.2d 422 (Wyo.1978); *Jones v. State*, 568 P.2d 837 (Wyo.1977); and *Daellenbach v. State*, 562 P.2d 679 (Wyo.1977). Prior to *Opie*, this court had said:

"Recanting testimony is viewed with suspicion, and when the trial judge, acting on a motion for a new trial, refuses to believe it, the appellate court, ordinarily at least, will feel bound by the decision." *Espy v. State*, 54 Wyo. 291, 318, 92 P.2d 549, 559 (1939).

This approach has been followed subsequent to *Opie*. *Sims v. State*, 495 P.2d 256 (Wyo.1972). *See Flaim v. State*, 488 P.2d 153 (Wyo.1971). Certainly, the court has

1. *Curless v. Curless*, 708 P.2d 426 (Wyo.1985); *Murphy v. Stevens*, 645 P.2d 82 (Wyo.1982); *Walton v. Texasgulf, Inc.*, 634 P.2d 908 (Wyo. 1981); *Shaw v. Shaw*, 544 P.2d 1004 (Wyo. 1976); *Barbour v. Barbour*, 518 P.2d 12 (Wyo. 1974); and *John B. Roden, Jr., Inc. v. Davis*, 460 P.2d 209 (Wyo.1969).

2. *Lacey v. State*, 803 P.2d 1364 (Wyo.1990); *King v. State*, 780 P.2d 943 (Wyo.1989); *Kavanaugh v. State*, 769 P.2d 908 (Wyo.1989); *Best v. State*, 769 P.2d 385 (Wyo.1989); *Cutbirth v. State*, 751 P.2d 1257 (Wyo.1988); *Keser v. State*, 737 P.2d 756 (Wyo.1987); *Gist v. State*, 737 P.2d 336 (Wyo.1987), *appeal after remand* 766 P.2d 1149 (Wyo.1988); *Bueno–Hernandez v. State*, 724 P.2d 1132 (Wyo.1986), *cert. denied* 480 U.S. 907, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987); *Frias*

*v. State*, 722 P.2d 135 (Wyo.1986); *Hopkinson v. State*, 679 P.2d 1008 (Wyo.1984), *cert. denied* 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984); *Lansing v. State*, 669 P.2d 923 (Wyo. 1983); *Grable v. State*, 664 P.2d 531 (Wyo.1983); *Siegert v. State*, 634 P.2d 323 (Wyo.1981); *Burns v. State*, 574 P.2d 422 (Wyo.1978); *Jones v. State*, 568 P.2d 837 (Wyo.1977); *Daellenbach v. State*, 562 P.2d 679 (Wyo.1977); *Salaz v. State*, 561 P.2d 238 (Wyo.1977); *Montez v. State*, 527 P.2d 1330 (Wyo.1974); *Flaim v. State*, 488 P.2d 153 (Wyo.1971); *Kennedy v. State*, 470 P.2d 372, *reh'g denied* 474 P.2d 127 (Wyo.1970), *cert. denied* 401 U.S. 939, 91 S.Ct. 933, 28 L.Ed.2d 218 (1971); and *Ballinger v. State*, 437 P.2d 305 (Wyo.1968).

been comfortable with the application of that rule in considering contrary affidavits by co-defendants, as in *Burns* and *Daellenbach,* and in a case in which the affidavit offered was contrary to the affiant's testimony in his own trial. *Jones.* In each instance, however, the court was addressing the recantation in the context of the *Opie* rule and arriving at a determination that the new evidence was not so material that it would produce a different result if a new trial were granted. In each case, there was a lot of evidence establishing the existence of the crime other than the testimony of the witness who recanted, and the recantation testimony clearly was improbable in light of the other evidence. Yet, the court in *Espy* gave the State the option of a new trial or accepting an affirmance on manslaughter rather than murder because it concluded that the recantation testimony refuted the testimony of the recanting witness that may have been crucial on the issue of malice leading to the verdict of murder in the second degree. Clearly, the court spoke in the context of materiality, not veracity.

The only case that involves a recantation by a victim witness is *Lacey.* This court affirmed a denial of a motion for a new trial based upon this ruling by the trial court:

> " '[I]t is my judgment that in any event, that the recanted testimony by Mrs. Lacey is totally without credibility and probably because of coercion or emotional turmoil brought about by the husband-wife relationship.' " *Lacey* 803 P.2d at 1367.

The difference between *Lacey* and the instant case becomes clear when one examines the language of the court in returning to the matter when it was raised under the guise of ineffective assistance of counsel. The court said:

> "Given the lack of credibility attributed by the district court to Diane's recanting testimony *and the evidence supporting her original story,* we simply cannot hold that either of Appellant's attorneys acted unreasonably or that Appellant has shown he was prejudiced by his attorneys' performance or lack of perform-

ance." *Lacey,* 803 P.2d at 1371 (emphasis added).

*Lacey* thus is cast into the same mold as the cases in which co-defendants have recanted.

This case is different from the prior cases, including *Lacey.* Under the *Opie* standard, neither this court nor the trial court could say that the recanting testimony was not so material that a different verdict might be returned if a new trial were granted. *See Espy,* 92 P.2d 549. The validity of the recanting testimony could not be compared with other evidence of the *corpus delicti* introduced at trial. It is only by invoking the gloss of *Larrison* that the motion for a new trial can be denied. If *Opie* is followed, the new trial should be granted. I would reverse the trial court, finding an abuse of discretion in the failure to apply *Opie,* and would order a new trial.

In my view, this is the only manner that the court can maintain the objective standard that should be used to evaluate a motion for a new trial based upon a claim of newly discovered evidence. It is also the correct way to balance the scales and effect justice in this case.